1  MATTHEW D. POWERS (S.B. #212682)
   mpowers@omm.com
2  ANDREW J. WEISBERG (S.B. #307519)
   aweisberg@omm.com
3  VICTORIA C. HARGIS (S.B. #313516)
   vhargis@omm.com
4  SARA N. PAHLAVAN (S.B. #332945)
   spahlavan@omm.com
5  CAROLINE K. KATZ (S.B. #329964)
   ckraeutler@omm.com
6  O'MELVENY & MYERS LLP
   Two Embarcadero Center, 28th Floor
7  San Francisco, CA 94111-3823
   Tel: (415) 984-8700
8  Fax: (415) 984-8701

9  *Counsel for Defendant*
   APPLE INC.

10

11                 **UNITED STATES DISTRICT COURT**

12                **NORTHERN DISTRICT OF CALIFORNIA**

13                      **SAN JOSE DIVISION**

14

15  PAUL ORSHAN, CHRISTOPHER          Case No.  5:14-cv-05659-EJD
    ENDARA, DAVID HENDERSON, and
16  STEVEN NEOCLEOUS, individually, and   **DEFENDANT APPLE INC.'S**
    on behalf of all others similarly situated,   **OPPOSITION TO PLAINTIFFS' MOTION**
17                                         **FOR CLASS CERTIFICATION**
                    Plaintiffs,
18
          v.
19
    APPLE INC.,
20
                    Defendant.
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................. 3

    A. All Computers and Smartphones Have Operating Systems.................... 4

    B. Consumers Received Information About iOS 8's Size from Many Sources, Including from Apple ...................................................................... 4

        1. Apple's Statements and Upgrade Screens................................... 4

        2. "Actual Formatted Capacity Less"............................................. 5

        3. Media Articles, Prior Ownership Experience, and Other Sources............. 6

    C. Many Consumers Knew iOS 8 Occupied Space...................................... 7

    D. Knowing That iOS Occupies Storage Space Does Not Change Many Consumers' Purchase/Upgrade Decisions ............................................ 8

    E. Customers Had the Ability to Return Devices and Downgrade from iOS8 ........... 9

    F. Plaintiffs Have Made a Number of Misleading Representations........................... 10

III. LEGAL STANDARD ....................................................................................... 13

IV. CERTIFICATION OF ANY CLASS IS IMPROPER....................................... 14

    A. No "Common" Issues............................................................................. 14

        1. Apple's Alleged Misrepresentation Is Not "Material" Because Consumers Would Have Made the Same Purchase/Upgrade Decisions ................ 16

        2. The Fact of Injury Is Not Subject to Common Proof................................. 18

    B. Individual Issues Will Predominate Under Rule 23(b)(3) ..................... 21

        1. Individualized Issues Predominate Determinations of "Materiality" ........ 21

        2. Individualized Issues Will Predominate as to Injury ............................. 23

    C. Plaintiffs Are Neither "Typical" nor "Adequate" ................................ 26

        1. Plaintiffs Are Not Typical......................................................... 26

        2. Plaintiffs Are Not Adequate...................................................... 28

    D. Certifying a Nationwide Class Would Be Improper .............................. 29

        1. Certification Is Improper Where Multiple States' Laws Apply................. 30

        2. California's "Governmental Interest" Test ................................. 30

            a. States' Consumer Protection Laws Vary in Material Ways........... 30

            b. Each State Has a Strong Interest in Applying Its Own Laws ........ 33

            c. Other States' Interests Would Be Impaired ................................... 33

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

**TABLE OF CONTENTS**
(continued)

Page

1        E.     No Class Can Be Certified Under Rule 23(c)(4) .................................................. 35

2   V.     CONCLUSION ............................................................................................................. 35

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

AdTrader v. Google,
2020 WL 1922579 (N.D. Cal. Mar. 24, 2020) ................................................................. 13, 27

Algarin v. Maybelline,
300 F.R.D. 444 (S.D. Cal. 2014) ...................................................................................... 16, 18

Alvarez v. NBTY,
331 F.R.D. 416 (S.D. Cal. 2019) ............................................................................................ 26

Amchem Prods. v. Windsor,
521 U.S. 591 (1997) ................................................................................................................. 13

Archie v. Pop Warner Little Scholars,
2019 WL 4439493 (C.D. Cal. Sept. 11, 2019) ....................................................................... 15

Aronson v. Greenmountain.com,
809 A.2d 339 (Pa. Super. Ct. 2002) ....................................................................................... 32

Arthur v. United Indus.,
2018 WL 2276636 (C.D. Cal. May 17, 2018) ........................................................................ 20

Berger v. Home Depot,
741 F.3d 1061 (9th Cir. 2014), *abrogated on other grounds*, *Microsoft v.
Baker*, 137 S. Ct. 1702, 1712 (2017) ..................................................................................... 22

Bonlender v. Am. Honda,
286 F. App'x 414 (9th Cir. 2008) ........................................................................................... 30

Bowling v. Johnson & Johnson,
2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019) ........................................................................ 28

Boysen v. Walgreen,
2012 WL 2953069 (N.D. Cal. July 19, 2012) ........................................................................ 18

Burns v. Volkswagen,
460 N.Y.S. 410 (N.Y. Sup. Ct. 1982) .................................................................................... 31

Carlotti v. ASUS,
2019 WL 11793361 (N.D. Cal. July 8, 2019) ........................................................................ 25

Carlotti v. ASUS,
2019 WL 6134910 (N.D. Cal. Nov. 19, 2019) ....................................................................... 25

Caro v. Procter & Gamble,
18 Cal. App. 4th 644 (1993) ................................................................................................... 16

Chow v. Neutrogena,
2013 WL 5629777 (C.D. Cal. Jan. 22, 2013) .................................................................... 19, 20

Cimoli v. Alacer,
2022 WL 580789 (N.D. Cal. Feb. 25, 2022) .................................................................... 31, 34

Civ. Rts. Ctr. v. Hospitality Props.,
867 F.3d 1093 (9th Cir. 2017) ................................................................................................. 13

Comcast v. Behrend,
569 U.S. 27 (2013) ............................................................................................................. 23, 25

**TABLE OF AUTHORITIES**
(continued)

Page

*Cover v. Windsor Surrey*,
2016 WL 520991 (N.D. Cal. Feb. 10, 2016) ........................................................................ 31

*Daugherty v. Am. Honda*,
144 Cal. App. 4th 824 (2006) .............................................................................................. 32

*Davis v. HSBC Bank Nev.*,
691 F.3d 1152 (9th Cir. 2012) .............................................................................................. 20

*Davis v. Powertel, Inc.*,
776 So. 2d 971 (Fla. Dist. Ct. App. 2000) .......................................................................... 32

*Davison v. Kia*,
2015 WL 3970502 (C.D. Cal. June 29, 2015) ...................................................................... 31

*Dix v. Am. Bankers Life Assur.*,
415 N.W.2d 206 (Mich. 1987) .............................................................................................. 32

*Dubin v. Miller*,
132 F.R.D. 269 (D. Colo. 1990) ............................................................................................ 28

*Ellis v. Costco*,
657 F.3d 970 (9th Cir. 2011) ................................................................................................ 27

*Estrada v. Johnson & Johnson*,
2015 WL 1440466 (E.D. Cal. Mar. 27, 2015) ...................................................................... 19

*Farar v. Bayer AG*,
2017 WL 5952876 (N.D. Cal. Nov. 15, 2017) ...................................................................... 15

*Faulk v. Sears*,
2013 WL 1703378 (N.D. Cal. Apr. 19, 2013) ...................................................................... 22

*Frezza v. Google*,
2013 WL 1736788 (N.D. Cal. Apr. 22, 2013) ...................................................................... 31

*Gaidon v. Guardian Life Ins.*,
750 N.E.2d 1078 (N.Y. 2001) .............................................................................................. 31

*Gartin v. S&M NuTec*,
245 F.R.D. 429 (C.D. Cal. 2007) .......................................................................................... 24

*Gary Plastic v. Merrill Lynch*,
903 F.2d 176 (2d Cir. 1990) ................................................................................................ 27

*Gen. Tel. v. Falcon*,
457 U.S. 147 (1982) ............................................................................................................ 26

*Gonzales v. Comcast*,
2012 WL 10621 (E.D. Cal. Jan. 3, 2012) ............................................................................ 20

*Grodzitsky v. Am. Honda*,
957 F.3d 979 (9th Cir. 2020) ................................................................................................ 18

*Handloser v. HCL Techs.*,
2021 WL 879802 (N.D. Cal. Mar. 9, 2021) .......................................................................... 13

*Hanon v. Dataproducts*,
976 F.2d 497 (9th Cir. 1992) ................................................................................................ 27

*Hartranft v. Encore Capital Grp.*,
543 F. Supp. 3d 893 (S.D. Cal. 2021) .................................................................................. 35

**TABLE OF AUTHORITIES**
(continued)

Page

*Hernandez v. Burger*,
  102 Cal. App. 3d 795 (1980)..................................................................................... 35

*Herron v. Best Buy*,
  924 F. Supp. 2d 1161 (E.D. Cal. 2013)..................................................................... 20

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)....................................................................................... 23

*In re Hyundai & Kia Fuel Economy Litig.*,
  926 F.3d 539 (9th Cir. 2019)..................................................................................... 21

*In re NJOY Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) .................................................................... 26

*In re POM Wonderful*,
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .......................................................... 24

*In re Vioxx Class Cases*,
  180 Cal. App. 4th 116 (2009) ............................................................................ 15, 16

*In re Volkswagen*,
  349 F. Supp. 3d 881 (N.D. Cal. 2018) ...................................................................... 31

*Johnson v. Harley-Davidson, LLC*,
  285 F.R.D. 573 (E.D. Cal. 2012) ....................................................................... 16, 25

*Junge v. Geron*,
  2022 WL 1002446 (N.D. Cal. Apr. 22, 2022) ........................................................... 24

*Klaxon Co. v. Stentor Elec. Mfg.*,
  313 U.S. 487 (1941).................................................................................................. 30

*Kline v. Wolf*,
  702 F.2d 400 (2d Cir. 1983)...................................................................................... 28

*Korea Supply v. Lockheed*,
  29 Cal. 4th 1134 (2003) ........................................................................................... 33

*Krommenhock v. Post Foods*,
  334 F.R.D. 552 (N.D. Cal. 2020) .............................................................................. 15

*Lassen v. Nissan N. Am.*,
  211 F. Supp. 3d 1267 (C.D. Cal. 2016) .................................................................... 19

*Lewallen v. Medtronic*,
  2002 WL 31300899 (N.D. Cal. Aug. 28, 2002)................................................... 33, 34

*Martin v. Monsanto*,
  2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) .......................................................... 34

*Mass. Mut. Life Ins. Co. v. Superior Ct.*,
  97 Cal. App. 4th 1282 (2002) ............................................................................ 15, 16

*Mazza v. Am. Honda*,
  666 F.3d 581 (9th Cir. 2012)............................................................................. passim

*McCann v. Foster Wheeler*,
  48 Cal. 4th 68 (2010) ............................................................................................... 34

*McCrary v. Elations Co.*,
  2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) ........................................................... 18

**TABLE OF AUTHORITIES**
(continued)

Page

*McKinnon v. Dollar Thrifty Auto. Grp.*,
  2015 WL 4537957 (N.D. Cal. July 27, 2015) ........................................................... 20

*McVicar v. Goodman*,
  2015 WL 4945730 (C.D. Cal. Aug. 20, 2015) .......................................................... 17

*Mendez v. R&L Carriers*,
  2012 WL 5868973 (N.D. Cal. Nov. 19, 2012) .......................................................... 28

*Messner v. Northshore Univ.*,
  669 F.3d 802 (7th Cir. 2012) .................................................................................... 24

*Moore v. Apple*,
  309 F.R.D. 532 (N.D. Cal. 2015) ............................................................................. 19

*Mullins v. Premier Nutrition*,
  2016 WL 3440600 (N.D. Cal. June 20, 2016) ..................................................... 30, 32

*n re Seagate*,
  326 F.R.D. 223 (N.D. Cal. 2018) ............................................................................. 30

*Nei v. Burley*,
  446 N.E.2d 674 (Mass. 1983) ................................................................................... 32

*Nguyen v. Medora Holdings*,
  2015 WL 4932836 (N.D. Cal. Aug. 18, 2015) .......................................................... 19

*Olean v. Bumble Bee*,
  31 F.4th 651 (9th Cir. 2022) ............................................................................. passim

*Otto v. Abbott Labs.*,
  2015 WL 9698992 (C.D. Cal. Sept. 29, 2015) .................................................... 15, 32

*Pelman ex rel. Pelman v. McDonald's Corp.*,
  396 F. Supp. 2d 439 (S.D.N.Y. 2005) ...................................................................... 32

*Philip Morris v. Hines*,
  883 So. 2d 292 (Fla. 4th Dist. Ct. App. 2003) .......................................................... 31

*Pierce-Nunes v. Toshiba*,
  2016 WL 5920345 (C.D. Cal. June 23, 2016) .......................................................... 22

*Reitman v. Champion Petfoods USA*,
  830 F. App'x 880 (9th Cir. 2020) ...................................................................... 13, 35

*Richardson Ford Sales v. Johnson*,
  676 P.2d 1344 (N.M. Ct. App. 1984) ....................................................................... 32

*Savino v. Comput. Credit*,
  164 F.3d 81 (7th Cir. 1998) ...................................................................................... 28

*Sevidal v. Target Corp.*,
  189 Cal. App. 4th 905 (2010) ................................................................................... 25

*Shuman v. SquareTrade Inc.*,
  2020 WL 7458001 (N.D. Cal. Dec. 18, 2020) .......................................................... 34

*Stearns v. Ticketmaster*,
  655 F.3d 1013 (9th Cir. 2011), *recognized as abrogated on other grounds*,
  *Jabbari v. Farmer*, 965 F.3d 1001, 1008 (9th Cir. 2020) ........................................ 15

Page

*Stickles v. Atria Senior Living,*
2021 WL 6117702 (N.D. Cal. Dec. 27, 2021) ................................................. 13, 35

*Stotz v. Mophie,*
2017 WL 11571083 (C.D. Cal. Dec. 14, 2017) ................................................. 28, 29

*Tasion Commc'ns v. Ubiquiti Networks,*
308 F.R.D. 630 (N.D. Cal. 2015) ....................................................................... 13

*Turcios v. Carma Labs.,*
296 F.R.D. 638 (C.D. Cal. 2014) ............................................................. 16, 25, 26

*Tyson Foods v. Bouaphakeo,*
577 U.S. 442 (2016) ............................................................................... 13, 21

*Valentino v. Carter-Wallace,*
97 F.3d 1227 (9th Cir 1996) ................................................................................ 13

*Villalpando v. Exel Direct,*
2016 WL 1598663 (N.D. Cal. Apr. 21, 2016) ...................................................... 20

*Wal-Mart v. Dukes,*
564 U.S. 338 (2011) ................................................................................... 13, 15

*Wash. Mut. Bank v. Superior Ct.,*
24 Cal. 4th 906 (2001) ......................................................................... 30, 31, 33

*Webb v. Carter's Inc.,*
272 F.R.D. 489 (C.D. Cal. 2011) ......................................................................... 16

*Zinser v. Accufix,*
253 F.3d 1180 (9th Cir. 2001) ................................................................... 30, 33

*Zlotnick v. Premier Sales Grp.,*
480 F.3d 1281 (11th Cir. 2007) ........................................................................... 32

**STATUTES**

Ala. Code § 8-19-14 ......................................................................................... 31

Ark. Code § 4-88-107(a)(1) ............................................................................. 32

Cal. Bus. & Prof. Code § 17203 ................................................................ 31, 33

Cal. Bus. & Prof. Code § 17208 ....................................................................... 31

Cal. Bus. & Prof. Code § 17500 ....................................................................... 31

Cal. Bus. & Prof. Code § 17535 ................................................................ 31, 33

Cal. Civ. Code § 1770 ....................................................................................... 32

Cal. Civ. Code § 1780 ....................................................................................... 31

Cal. Civ. Code § 1783 ....................................................................................... 31

Cal. Civ. Proc. Code § 338(d) .......................................................................... 31

Colo. Rev. Stat. §§ 6-1-105(1)(e), (g), (i), (u) ................................................. 32

Fla. Stat. § 501.202(2) ...................................................................................... 31

Fla. Stat. § 501.212(3) ...................................................................................... 33

**TABLE OF AUTHORITIES**
(continued)

| | Page |
|---|---|
| Fla. Stat. Ann. § 501.204(1) | 32 |
| Fla. Stat. Ann. § 95.11(3) | 31 |
| Ga. Code Ann. § 10-1-399(a) | 31 |
| Ga. Code Ann. § 10-1-399(c) | 33 |
| Iowa Code § 714H.3(*l*) | 32 |
| La. Rev. Stat. Ann. § 51:1409(A) | 31 |
| Me. Rev. Stat. Ann. tit. 14, § 752 | 31 |
| N.J. Stat. § 56:8-19 | 33 |
| N.Y. Gen. Bus. Law § 349 | 32, 33 |
| N.Y. Gen. Bus. Law § 350 | 32 |
| S.C. Code Ann. § 39-5-140(a) | 31 |
| Tex. Bus. & Prof. Code Ann. § 17.565 | 31 |
| Wyo. Stat. Ann. § 40-12-105 | 32 |

**<u>OTHER AUTHORITIES</u>**

| | |
|---|---|
| Restatement (Second) of Conflict of Laws § 148 | 34 |

**<u>RULES</u>**

| | |
|---|---|
| Fed. R. Civ. P. 23 | 1, 3, 12 |
| Fed. R. Civ. P. 23(a) | passim |
| Fed. R. Civ. P. 23(a)(2) | 14 |
| Fed. R. Civ. P. 23(a)(3) | 27 |
| Fed. R. Civ. P. 23(b)(3) | 2, 23, 25 |
| Fed. R. Civ. P. 23(c)(4) | 2, 35 |
| Fed. R. Civ. P. 26(b)(3) | 13 |
| Fed. R. Civ. P. 26(c)(4) | 13, 35 |

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1   **I.      INTRODUCTION**[1]

2           The Court should deny Plaintiffs' Motion for Class Certification ("Motion").  Rather than

3   grapple with the actual record in this case, Plaintiffs ignore critical evidence and assert "facts"

4   that are simply false.  Plaintiffs have the burden of proving that Rule 23's requirements have been

5   met, but here the evidence shows just the opposite.  Plaintiffs contend that Apple somehow

6   misled *all* persons who bought new 16 GB iPhones and iPads that either came with iOS 8

7   preinstalled, or who subsequently upgraded to iOS 8, because the iOS 8 operating system used

8   some of that 16 GB of storage.  Based on that, Plaintiffs assert three claims, under California's

9   Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumers Legal

10  Remedies Act ("CLRA").  While all are meritless, for purposes of Plaintiffs' Motion all that

11  matters is that they cannot be proven with classwide, common evidence.

12          Certifying any of Plaintiffs' claims requires them to show, with common evidence, that

13  Apple's alleged misrepresentations were (a) material to class members' decisions to (i) purchase

14  16 GB iPads or iPhones with iOS 8 preinstalled (for the Preinstall Class), or (ii) upgrade their

15  16GB iPads or iPhones to iOS 8 (for the Upgrade Class), which (b) thereby caused them injury.

16  But neither the materiality of Apple's supposed misrepresentations, nor the fact of injury due to

17  them, can be proven with common evidence.  Instead, those questions turn on individualized facts

18  that will be outcome-determinative for many consumers—including whether the consumer

19  already knew, or was specifically told (including by Apple), that iOS took up storage space.  For

20  example, the fact-finder will need to consider whether a given consumer reviewed disclosures

21  that iOS *did* take up space, including "upgrade screens" that Apple has displayed to consumers—

22  including for prior versions of iOS—that explain exactly how much additional data was required

23  to update the operating system.  Customers who clicked through such screens before buying an

24  iOS 8 device were thus already told that iOS took up space, and for consumers who upgraded to

25  iOS 8, this "upgrade screen" informed them exactly how much more data would be downloaded

26  to install iOS 8 (a fact that Plaintiffs' Motion never mentions).  The fact-finder would also need to

27  ───────────────
[1] Unless otherwise indicated, all emphasis is added and internal quotations and citations are omitted.  "Mot." refers to Plaintiffs' Motion for Class Certification (Dkt. 124); "Compl." refers to

28  the Consolidated and Amended Class Action Complaint (Dkt. 80); and "PD" refers to the Powers Declaration.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1   consider consumers' prior smartphone/tablet ownership experience, their exposure to widely

2   available articles and reviews that explained the storage space needed for iOS 8, and whether—

3   given that all smartphones have operating systems that use space and Apple's iOS 8 was one of

4   the *most efficient* (*i.e.*, smallest) available—consumers would have made the same purchases with

5   different disclosures.   The fact-finder will also need to consider other individualized facts, such

6   as whether consumers ever ran out of storage space; whether they could downgrade to iOS 7 (for

7   the Upgrade Subclass), and whether they learned that iOS 8 used space in time to return their

8   device(s) (for the Preinstall Subclass).

9        Plaintiffs simply ignore those facts.   Instead, their brief focuses on supposedly "common"

10   facts that are insufficient to show whether consumers were actually misled.   For example, they

11   spend much time arguing that consumers were told they would receive "16GB," that iOS used up

12   to 22.6% of that space because of "intentional design choices" by Apple, and that Apple's only

13   defense to that capacity "shortage" is supposedly the fact that its website and packaging said

14   "actual formatted capacity less."   Not only are those contentions wrong on the merits,[2] Plaintiffs'

15   focus on them distracts from the actual issues for purposes of class certification: whether

16   Plaintiffs can prove, on a classwide basis, using common evidence, that "failing to disclose" that

17   iOS used storage space on an iPhone or iPad was "fraudulent" and injured consumers.

18        Plaintiffs cannot do so here: the lack of classwide common evidence showing the

19   materiality of Apple's supposed "misrepresentations" and "omissions," or showing that any

20   "injury" was caused thereby, means that Plaintiffs cannot satisfy the "commonality" requirement

21   of Rule 23(a), the "predominance" requirement of Rule 23(b)(3), or the requirements for their

22   proposed "issue class" under Rule 23(c)(4).   That is because the evidence conclusively shows that

23   Apple's alleged "misrepresentations" and "omissions" were neither material nor injurious for

24   large portions of the putative classes.   As discussed below, many consumers already knew (from

25   seeing Upgrade Screens, prior ownership experience, etc.) that iOS 8 occupied space before

26   [2] As discussed below, there is no dispute that Apple's 16GB iPhones and iPads *do*, in fact, come
with 16GB of storage capacity.   And far from a "design choice" by Apple, installing operating
27   systems (like iOS 8) is necessary to be able to utilize nearly all computers, laptops, and
smartphones ever made.   Moreover, iOS 8 was also the most efficient (*i.e.*, smallest) operating
28   system available to smartphone customers at the time, and at an installation size of between
2-3GB, only used about 0.5-1 GB more compared to the prior operating system, iOS 7.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1    purchasing their 16GB iOS 8 devices (or upgrading their existing devices to iOS 8), and survey

2    evidence confirms that being expressly told that iOS 8 occupies 2-3GB of storage space does not

3    change many consumers' willingness to purchase 16GB iOS 8 devices (or to upgrade to iOS 8).

4    In fact, all three named Plaintiffs *chose* to buy iOS 8 devices despite *full knowledge* of iOS 8's

5    size—a fact we know because they all either bought 16GB iOS 8 devices or upgraded their

6    existing 16GB devices to iOS 8 *after suing Apple in this case*.

7        Plaintiffs also cannot satisfy the typicality or adequacy requirements of Rule 23(a)

8    because they submitted false declarations and included multiple inaccurate allegations in their

9    complaint.  The declarations that each Plaintiff has filed in support of their Motion contain false

10   statements on material issues—including stating (in identical language) that they "would not have

11   purchased the Devices were [they] made aware of the limitations of the operating system and the

12   16GB capacity" without mentioning their deposition testimony to the contrary.  Several of the

13   allegations in Plaintiffs' complaint are also inaccurate—including allegations about which

14   devices are at issue and when their iOS 8 updates were installed (and, for Neocleous, a false claim

15   that he ever updated to iOS 8 at all).  Plaintiffs also failed to preserve their devices, preventing

16   Apple from testing whether Plaintiffs were actually using all of the Devices' 16GB of storage.

17       Finally, Plaintiffs' attempt to apply California law to a nationwide class should be rejected

18   on its face—state consumer protection laws vary significantly, and the law of the state where a

19   customer lives (and bought their device) applies to their claims.  In short, Plaintiffs cannot satisfy

20   Rule 23 and the Court should reject Plaintiffs' Motion in its entirety.

21   **II.    FACTUAL BACKGROUND**

22       Plaintiffs' Motion requires this Court to find that it is possible to determine, on a

23   classwide basis, whether all consumers of 16 GB iPhones and iPads that ran iOS8 were "misled"

24   and injured because iOS8 used some of the storage on their devices' hard drives.  But the record

25   shows that those issues are not subject to common proof.  Instead, answering those questions for a

26   given consumer will depend on complex, individualized facts (many of which are never

27   mentioned by Plaintiffs) including: (1) Apple repeatedly provided class members with

28   information about the size of iOS (including iOS 8); (2) most consumers already know that iOS

1  occupies storage space; (3) even after being told that iOS occupies 2-3 GB storage space, most

2  consumers would not have acted differently; and (4) consumers were able to return their devices,

3  or downgrade to iOS 7, if they were dissatisfied with iOS 8.  Below, Apple sets out the relevant

4  factual landscape, much of which Plaintiffs completely omit from their Motion.

5    **A.    <u>All Computers and Smartphones Have Operating Systems</u>**

6    As a preliminary matter, the core "problem" Plaintiffs complain about—that a portion of

7  their devices' storage was used by the operating system—is not unique to iOS 8 or even to Apple,

8  and consumers are well aware of that fact.  Since the personal computer revolution in the 1980s,

9  computing devices—including desktops, laptops, smartphones, and tablets—have been sold with

10  a pre-installed operating system like Windows, iOS, Android, or MacOS.  PD Ex. UU.  That is

11  because devices cannot function without an operating system—the operating system enables

12  devices to perform the functions that consumers expect, such as accessing the internet, playing

13  music or videos, sending emails and texts, or running apps.  *Id.*  Nor was iOS 8 significantly

14  larger than prior versions.  iOS 7, for example, used between 1.5-2 GB of space, compared with

15  2-3 GB of space for iOS 8.  Harmon Dec. Ex. A.  And iOS 8 was *smaller* (took up less storage

16  space) than the operating systems on competing devices sold at the time.  *Id.* ¶ 17.; PD Ex. JJ.

17    **B.    <u>Consumers Received Information About iOS 8's Size from Many Sources, Including from Apple</u>**

18    Apple has never misrepresented iOS 8's size or the fact that it took up space.  In fact, the

19  "truth" Apple purportedly hid—that iOS 8 occupied storage space—was well publicized.

20    **1.    Apple's Statements and Upgrade Screens**

21    When iOS 8 launched on September 17, 2014, Apple publicly described iOS 8 as

22  its "biggest iOS ever," with "big updates to apps you use every day," "a whole new way to share

23  content with your family," and "exciting new connections between apps and between devices."

24  PD Ex. LL.  Apple used similar language in the upgrade screen that many consumers saw before

25  upgrading to iOS 8 ("Upgrade Screen"), proclaiming, "This update is the biggest release since the

26  launch of the App Store, with hundreds of new features including new Messages and Photos

27  features, QuickType keyboard, a new Health app, Family Sharing, iCloud Drive and more."

28  Harmon Dec. Ex. C.  Via that same Upgrade Screen, Apple explicitly disclosed to many

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1  customers—including all three named plaintiffs—that iOS (whether iOS 8 or prior versions)

2  would occupy storage space.  iOS devices can be upgraded either via WiFi, or by using iTunes.

3  *See id.* ¶ 12.  An Upgrade Screen appears each time an Apple

4  customer wirelessly upgrades their device's iOS—before they can

5  upgrade, they need to review, and click through, an Upgrade

6  Screen informing them how

7  much storage space

8  downloading the new iOS

9  version requires, and how

10  much space they need

11  temporarily available to

12  perform the upgrade itself:



13  *Id.* ¶ 9, Ex. C (orange underlines for emphasis).  Thus, when a customer upgraded their device

14  wirelessly to iOS 8 (or any prior version), they were told how much additional data they would

15  need to download to update their operating system, as well as how much space they needed

16  temporarily available to run the iOS installation.  ███████████████████

17  ███████████████████████████████  and large majorities of putative class members (62.9%

18  for iPhone, 61.6% for iPad) upgraded their at-issue devices by WiFi at least some of the time

19  (Butler Rep. Table 18), meaning that many consumers would have had to click through screens

20  like those depicted above to update their operating system. Harmon Dec. ¶ 9.[3]

21  **2.    "Actual Formatted Capacity Less"**

22  Apple's website and iPhone/iPad product packaging also uniformly included the statement

23  "1 GB = 1 billion bytes; *actual formatted capacity less*."  PD Exs. MM, NN, OO, PP, SS, TT.

24  (On Apple's website, that statement appeared in a footnote prominently appended to the

25  "Capacity and Price" table comparing different model options for purchase.)  *Id.* Exs. MM, NN,

26  SS, TT.  As this Court explained, "no reasonable consumer could have read th[o]se materials and

---

27  [3] Each Plaintiff only recalls upgrading by WiFi, and none of them denied seeing these Upgrade
Screens before and/or during the upgrades/purchases at issue.  PD Ex. C (hereinafter, "Endara

28  Tr.") at 85:16-86:1, 94:3-5, 139:12-16; *id.* Ex. D (hereinafter, "Orshan Tr.") at 55:1-8, 56:23-
57:14; *id.* Ex. A (hereinafter, "Neocleous Tr.") at 90:11-14, 92:10-14, 93:2-5, 100:14-21.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-cv-05659-EJD

1    concluded that an entire 16GB would be available for personal use on a 16GB Apple device."

2    Dkt. 62 at 3:8-10 (citing Dkt. 47 at p.8).  Accordingly, any claim that consumers were "misled"

3    necessarily turns on their individualized understandings about how much space iOS 8 occupied.

**3.     Media Articles, Prior Ownership Experience, and Other Sources**

5         On the day iOS 8 launched, the Wall Street Journal ran a story featuring a full-size image

6    of the iOS 8 Upgrade Screen, explaining that users would need up to 5.7GB of free space

7    temporarily available to install the update, and that "[i]f you have a 16GB phone, this [5.7GB]

8    means a massive chunk of your photos, videos, music and apps." PD Ex. FF.  Similar articles—

9    many of which also featured an image of the iOS 8 Update Screen—ran in other popular

10   consumer publications the same day.  *See, e.g.*, *id.* Exs. HH, II, GG.

11        Given that many purchasers during the class period █████████████████████

12   ████████████████████████████████████████████████████████

13   ███████, and ██████████████████████████████████████████████

14   ██████████████████████████████████ customers at the time would also

15   have been aware from prior ownership experience that operating systems (and preinstalled apps)

16   occupy storage space.[4]

17        As the survey by Apple's expert, Sarah Butler, confirms, various consumers were also

18   exposed to additional sources of information before purchasing their iOS devices at issue—

19   including friends' recommendations; discussions with salespeople; Apple websites; mobile

20   providers; retail stores; and out-of-store advertising or commercials.  Butler Rpt. Table 20.

21   Consumers' most commonly considered source of information prior to purchase was

22   recommendations from family and friends.  *Id.*  And while Plaintiffs' Complaint focuses

23   extensively on product packaging, respondents' least-selected specific information source was

24   review of the packaging or box.  *Id.*

25   ───────────────

26   [4] All three named plaintiffs were repeat purchasers of iOS devices.  Before buying his iPhone 6,
     Plaintiff Endara personally used an iPhone 3, a 16GB original iPad, and a 16GB iPhone 4S
     (which he had already upgraded to iOS 8).  Endara Tr. at 70:17-24, 73:20-25, 77:13-21, 92:12-16,
27   139:17-20, 184:5-185:17.  Orshan bought a 16GB iPhone 4 in 2011, and a 16GB iPad 4th Gen in
     2012, before purchasing his iPhone 5S.  Orshan Tr.. at 48:6-24; *id.* Ex. 2 at p.7.  Plaintiff
28   Neocleous owned an iPhone 4 before purchasing his 16GB iPhone 5 at issue.  Neocleous Tr. at
     57:19-25, 59:2-4.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1

### C.      Many Consumers Knew iOS 8 Occupied Space

2          In light of the aforementioned publicity, it is not surprising that when asked whether iOS

3   takes up storage space on a 16GB device, less than 5% of respondents in Butler's survey believed

4   that iOS did not occupy any space.  Butler Rpt. ¶ 81, Table 10.[5][6]  *Id.*  That is likely why

5   consumers rarely complained about the size of iOS 8. ███████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ███████████████████████████████████████████

11         Even though the issue of whether consumers understood iOS 8 used storage space is a

12  central issue in this case, Plaintiffs offer no evidence on this issue—let alone evidence showing

13  this issue can be resolved in their favor with common proof.  Plaintiffs' survey expert, Dr.

14  Groehn, *never even asked* whether respondents understood that iOS occupies storage space—in

15  his words, "[t]hat was not my assignment."  Groehn at 68:4-9.  At deposition, Groehn claimed he

16  could not remember whether he had ever even *considered* asking respondents whether they

17  understood that iOS took up space.  *Id.* at 66:7-14.  Instead, Groehn merely asked respondents

18  whether they understood that 16GB was available for their "own use"—an unreliable question,

19  with multiple methodological biases, that never explained what "own use" meant.  Butler Rpt. ¶¶

20  35-42.  In fact, several respondents took it upon themselves to note Groehn's questions were

21  confusing because iOS occupies storage space.  *See id.* Table 4.

22         In their brief, Plaintiffs assert that consumers complained about iOS needing storage

23  ─────────────────────────────────────────
[5] Over 70% of respondents knew that iOS occupies some storage capacity.  Butler Rpt. Table 10.
24  [6] When asked a similar question, fewer than 5% of respondents believed that pre-installed apps
    would not occupy any space, while at least 77.9% of respondents expected that pre-installed apps
25  would occupy some storage space.  Butler Rpt. ¶ 83, Table 11. ████████████████████████

26  ████████████████████████████████████████████████████
    ████████████████████████████  While Plaintiffs also take passing issue
27  with the storage size occupied by iOS devices' hard drive "partition[s]" (Mot. at 1:15), they
    provide no evidence about it, let alone that it was material to consumers' purchase/upgrade
28  decisions. ████████████████████████████████████████

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1   space. Those assertions are misleading at best. As discussed *supra*, there were very few actual

2   customer complaints about the size of iOS 8 or the fact that it used space. Instead, Plaintiffs have

3   conflated customers' complaints about (1) the "swap" space (5-7GB) *temporarily* needed to run

4   the installation process with (2) the smaller amount of space permanently occupied by iOS 8 itself

5   once the process was complete. The "complaints" plaintiffs reference are almost exclusively by

6   users who wanted to update to iOS 8 but had to free up 5-7GB of temporary swap space to do so.

7   *See* Mot. at 5:5-10; Shelquist Decl. Ex. 21 (discussing swap space);

8   [redacted][7] And customers who

9   were told they needed to free up 5-7GB to run the install process were clearly on notice that iOS 8

10  would use storage. Plaintiffs also claim that "foreign governments" supposedly "intervened" to

11  stop "Apple's fraud" (Mot. at 11:6-7), which purportedly led Apple to revise its disclosure

12  statements (*id.* at 12-14), but those claims are not only irrelevant to Plaintiffs' claims (let alone

13  suitability for class certification), they are similarly misleading and contradicted by the record.

   **D.   Knowing That iOS Occupies Storage Space Does Not Change Many**
   **     Consumers' Purchase/Upgrade Decisions**

15       The core claim in Plaintiffs' Complaint is that if consumers knew that iOS 8 used storage

16  space, they would not have purchased 16GB iOS 8 devices, or upgraded their 16GB devices to

17  iOS 8. *See* Compl. ¶¶ 23, 25, 30. But Plaintiffs do not (and cannot) provide any classwide

18  evidence regarding that question, because they never measured it. As both of Plaintiffs' experts

19  admitted in deposition, they never addressed whether customers would have made different

20  purchase or upgrade decisions—again, that was not part of their "assignment."[8] Instead, the

21  unrebutted evidence shows that even when they knew that iOS 8 occupied 2-3GB of storage,

22  most putative class members—including *all three named plaintiffs*—would have bought their

23  ─────────────────────
    [7] [redacted]

24  [redacted]

25  MP Ex. P (hereinafter "Groehn Tr.") at 150:14-22, 151:22-152:8 ("Can you direct me to any
    question in the survey that you believe bears on whether consumer behavior and purchase
    decisions would have changed had more complete disclosures about iOS 8's consumption of

26  storage capacity been disclosed? [Objection] [A] I -- I did -- I included questions that related to
    the assignment as outlined ... and it was not my professional opinion that there were other

27  questions required to -- to fulfill the assignment."). MP Ex. I (hereinafter, "Londre Tr.") at
    124:20-125:4 ("Q. Please tell me what percentage of class members, if you can, would have, in

28  your opinion, made different purchase decisions if Apple had explicitly disclosed how much
    storage space iOS 8 used? [Objection] [A] Again, ... I wasn't asked to do that.").

same devices at the same price.  Butler specifically addressed the issue in her survey, and few respondents indicated they would have not made a purchase at all or switched to a different brand of phone (15.8% for iPhone, 17.1% for iPad).  Butler Rpt. Table 14.  Instead, respondents' reactions varied—39% of iPhone users and 38.3% of iPad users would have bought the same device anyway, and 27.6% of iPhone users and 33.1% of iPad users would have bought a *more expensive* Apple device with more storage (*id.*)—meaning that even after knowing about the "problem" that iOS 8 occupied storage space, they still would have purchased iOS devices from Apple at market prices.  And, critically, *all* three of the named plaintiffs (1) admitted in deposition that they may have bought/upgraded their devices anyway,[9] and (2) kept buying 16GB devices with iOS 8 (or upgrading 16GB devices to iOS 8) even after filing this lawsuit.[10]

### E.    <u>Customers Had the Ability to Return Devices and Downgrade from iOS8</u>

Customers who were unhappy with either iOS 8 or their iOS 8 device also had the opportunity to return the device or "downgrade" it and revert to iOS 7.  For nine days after iOS 8 launched on September 17, 2014, (*i.e.*, until September 26, 2014), any user who upgraded their iPhone or iPad to iOS 8 (*i.e.*, a member of the Upgrade Subclass) was able to "revert" that upgrade and go back to the most recent version of iOS 7.  Harmon Dec. ¶¶ 2-3.  Apple's return policy also allowed dissatisfied customers to return or exchange their devices for any reason within 14 days of purchase.  Kirkpatrick Dec. ¶ 5.  Accordingly, members of the Preinstall Subclass who were unhappy that iOS occupied space could have simply asked for a refund.  Given that determining storage availability only takes a few clicks (MP Ex. QQ), finding out that less than 16GB of storage was available for personal use within 14 days is not difficult.  Plaintiff Endara, for example, very likely became aware that iOS 8 was occupying storage space on his 16GB iPhone 6 at issue within the 14-day return window.[11]  But he did not return that iPhone 6 to

---

[9] *E.g.*, Orshan Tr. at 94:15-22, 95:5-17, 96:2-97:18; Endara Tr. at 98:19-99:4, 100:4-11, 120:21-121:15; Neocleous Tr. at 67:12-22, 73:17-20, 74:5-15, 104:7-13, 105:4-10.

[10] In February 2015, two months after filing suit, Endara purchased another 16GB iPhone 6, with iOS 8, for his son.  O'Neil Dec. Exs. Q, R, S; Endara Tr. at 197:11-20, 198:4-9.  Orshan's 16GB iPad was not upgraded to iOS 8 until July 2015—seven months after he sued Apple.  Dkt. 1; O'Neil Dec. Ex. E; Orshan Tr. at 118:11-13, 119:10-18, 120:11-14, 120:15-121:3.  Neocleous bought a 16GB iPhone 6, with iOS 8 preinstalled, two months after he sued Apple in February 2015.  PD Ex. B; O'Neil Dec. Ex. Z; Neocleous Tr. at 138:1-12 (Apr. 2015 purchase).

[11] Endara purchased his iPhone 6 on December 14, 2014 (Endara Tr. at 119:17-22), and sued Apple 16 days later, on December 30, 2014.  Dkt. 1.  Endara testified that he first contacted

1    Apple (or AT&T), even though he knew he could do so.  Endara Tr. at 135:24-136:2, 154:4-13.

2       **F.** **Plaintiffs Have Made a Number of Misleading Representations**

3       Although Plaintiffs claim that they were misled by Apple, the facts do not support that

4    claim.  The record does show, however, that Plaintiffs have made a number of false

5    representations in their court filings, misrepresenting key facts bearing on their claims.

6       ***Despite full knowledge, Plaintiffs purchased/upgraded 16GB devices with iOS 8***:

7    Although Plaintiffs' supporting declarations each state that they would not have purchased their

8    16GB devices at issue had they known that iOS 8 would occupy storage space (Dkts. 124-32 ¶ 5,

9    124-33 ¶ 5, 124-34 ¶ 5), and their Complaint similarly alleges that they would not have

10   purchased/upgraded their devices at issue had they known that information (Compl. ¶¶ 23, 25,

11   30), none of that is true.  All three named Plaintiffs chose to buy new 16GB iPhones with iOS 8

12   preinstalled, or upgrade their existing 16GB devices to iOS 8, with full knowledge of exactly how

13   much space iOS 8 used—a fact we know because those purchases/upgrades all occurred just

14   months *after suing Apple in this case*.[12]

15      ***All three Plaintiffs admitted that even if they knew iOS occupied storage space, they***

16   ***might have made the same purchase decisions***:  Despite the aforementioned claims in Plaintiffs'

17   supporting declarations and Complaint, each plaintiff admitted at deposition that, even if they had

18   been expressly told that iOS 8 would occupy 2-3GB of space before purchasing their devices at

19   issue, they would not necessarily have changed their purchase decisions.[13]  That testimony

20   directly contradicts Plaintiffs' supporting declarations, each of which contends (in identical

21   language and without mentioning their contrary testimony) "I would not have purchased the

---

22   counsel about pursuing legal action "approximately two weeks" *before* the suit was filed. (Endara
     Tr. at 49:13-20).
23   [12] O'Neil Dec. Exs. Q, R, S; Endara Tr. at 197:11-20, 198:4-9; Dkt. 1; O'Neil Dec. Ex. E; Orshan
     Tr. at 118:11-13, 119:10-18, 120:11-14, 120:15-121:3; PD Ex. B; O'Neil Dec. Ex. Z; Neocleous
24   Tr. at 138:1-12.
     [13] Orshan Tr. at 93:23-94:7, 94:15-22, 95:5-17 ("Q. Can you tell me with any certainty that you
25   would have declined to buy the iPhone 5s if you had been told the information that you explained
     earlier that Apple should have told you? ... A. I can't say. Q. You can't say one way or the other
26   whether you would have refused to buy the iPhone 5s at the price you paid? A. Correct.");
     Neocleous Tr. at 67:12-22, 73:17-20, 74:5-15 ("Q. Okay. It's possible you would have still
27   bought the iPhone 5? A. Possibly, yeah."); Endara Tr. at 145:17-23 ("Q. Had you known at the
     time of purchase that your iPhone 6 at issue would contain 16 gigabytes of storage space, roughly
28   2 to 3 gigabytes of which would not be available for your personal use because it was taken up by
     the operating system, would you have done anything differently? A. I do not know.").

APPLE'S OPP. TO MOT. FOR CLASS CERT.
     NO. 5:14-CV-05659-EJD

1   Devices were I made aware of the limitations of the operating system and the 16GB capacity."

2   Dkts. 124-32 ¶ 5, 124-33 ¶ 5, 124-34 ¶ 5.

3   **Orshan and Neocleous admitted they might have upgraded to iOS 8 anyway**:  In their

4   Complaint, Plaintiffs Orshan and Neocleous allege that had they known the amount of storage

5   capacity iOS 8 occupied, they would not have upgraded to it.  Compl. ¶¶ 23, 30.  (Plaintiff Endara

6   makes no claim about upgrading.)  Yet their supporting declarations do not address that issue

7   (Dkts. 124-32, 124-33), and their deposition testimony contradicts it entirely—indeed, Neocleous

8   testified that he *knew* iOS 8 would occupy ~1GB of additional space, and upgraded nonetheless.[14]

9   **Each Plaintiff has made additional false representations about key issues**:  In the

10  Complaint, Plaintiff Neocleous alleges he bought an iPhone 5 in August 2012 with iOS 7

11  preinstalled.  Compl. ¶ 29.  His declaration and the Complaint also claim that he upgraded it

12  "from iOS 7 to iOS 8 when prompted that the update was available" (Dkt. 124-33 ¶¶ 2-3) and

13  would not have done so had he known iOS 8 would use space.  Compl. ¶ 30.  None of that is true.

14  Neocleous could not have purchased an iPhone 5 with iOS 7 preinstalled in August 2012 (iPhone

15  5 came out in September 2012, and iOS 7 came out in September 2013), (PD Exs. EE, KK;

16  O'Neil Dec. Ex. W; Neocleous Tr. at 64:8-65:3, 82:3-19), and

17

18

19       Plaintiff Endara's declaration similarly claims that "[s]torage space was an important

20  factor to me in my purchasing decision," and that he "relied on the statements directly on the

21  package that the Device included 16GB" when purchasing the iPhone 6 at issue.  Dkt. 124-34 at

22  ¶¶ 2, 4.  Neither is true.  Endara testified that his decision to purchase his 16GB iPhone 6 at issue

23  had *nothing to do with storage space*—he bought it because he thought it would run iOS 8 faster

24  than his then-current iPhone did—and he admitted that he did not recall looking at the "package"

25  at all.  Endara Tr. at 98:19-99:4, 100:4-11, 120:12-14, 120:21-121:15, 162:5-8.

---

[14] Orshan Tr. at 97:12-18 ("Q. Can you tell me with any certainty that you would have declined to do that update to iOS 8 back in 2014 if Apple had provided the information that you contend they should have? [Objection]. [A.] I can't tell you with certainty one way or the other."); Neocleous Tr. at 105:4-10 ("I just want to make sure that the -- I want to make sure that the question and answer are clear. Being told that you were downloading approximately a gigabyte to install iOS 8, didn't stop you from installing iOS 8 at the time, correct? A. No. I still downloaded it.").

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1        Plaintiff Orshan alleged that he upgraded two 16GB iPhone 5's and two 16GB iPads to

2    iOS 8 before filing suit. *See* Dkt. 1 ¶¶ 16, 17; Compl. ¶¶ 21, 22.  But Orshan's first device is a

3    16GB iPhone 5S (not an iPhone 5, as alleged) (O'Neil Dec. Ex. G; Orshan Tr. at 102:12-21); his

4    second iPhone is actually a 64GB iPhone 6 (purchased six months after he sued Apple) (*id.* at

5    83:17-24; PD Ex. T; O'Neil Dec. Ex. H); he is only suing Apple over one iPad, not two (Orshan

6    Tr. at 47:18-48:5); and his remaining iPad was not upgraded to iOS 8 until July 2015 (*seven*

7    *months after he sued Apple*). *Id.* at 120:11-14, 121:4-13; O'Neil Dec. Ex. E.  While Orshan's

8    declaration statement that he upgraded that iPad to iOS 8 "following purchase" (Dkt. 124-32 ¶ 3)

9    is technically true, his failure to mention that he upgraded *after* suing Apple makes it misleading

10   at best.  *See* O'Neil Dec. ¶ 9, Ex. E.

11       ***Plaintiffs failed to preserve key evidence***: As Magistrate Judge Cousins explained,

12   Plaintiffs' actual use of their devices' storage is critical here.  Dkt. 118 at 2:24-26 ("In a class

13   action case about storage capacity on Apple devices, discovery about the class representatives'

14   devices and storage seems central to the claims and defenses.").  But Plaintiffs did not preserve

15   their devices.  Plaintiff Orshan had his iPhone 5 when he first sued (Orshan Tr. at 71:19-22), but

16   he took no steps to safeguard that phone (*id.* at 81:6-14) and it is now "a black hole" that is

17   "completely unoperational." *Id.* at 111:20-112:15.  Plaintiff Endara no longer has his iPhone 6

18   because he traded it in for a newer iPhone in mid-2016, roughly a year and a half after these

19   proceedings began.  Endara Tr. at 146:12-19.  The only information Plaintiffs have been able to

20   provide about that device is that as of December 19, 2014, it had 6.9 GB of unused free space.

21   PD Ex. X p.7.  And Plaintiff Neocleous (or his counsel) appear to have reset his iPhone 5 in late

22   2021—but for that reset, the phone would have shown that it had never been updated to iOS 8.[15]

---

23   [15] As discussed above, ███████████████████████████████████████████████

                                 On August 27, 2021, Apple served an

24   interrogatory requesting that Plaintiff Neocleous state "the amount of storage that is currently
being used on th[at] 16 GB iPhone 5." PD Ex. R at pp. 1, 4.  Just a few days before that

25   interrogatory was answered ███████████████████████████████████████████████

26   █████████████████████████████████████████████████████████████████████████████

27                                       Neocleous then responded to Apple's

28   interrogatory on October 4, 2021, stating only that he "has not thus far been able to access the
information" requested.  PD Ex. R p.4.  On October 25, 2021, during a meet-and-confer call
Plaintiffs' counsel informed Apple that this was because Neocleous's device was "Activation

1    III.    **LEGAL STANDARD**

2          Plaintiffs bear the burden of showing by a preponderance of the evidence that class

3    certification is appropriate under Federal Rule of Civil Procedure ("FRCP") 23.  *Wal-Mart v.*

4    *Dukes*, 564 U.S. 338, 350-51 (2011).  First, Plaintiffs must establish that Rule 23(a)'s

5    requirements are met: numerosity, commonality, typicality, and adequacy of representation.  *Id.* at

6    349.  Making those showings requires more than meeting a "mere pleading standard" (*id.* at

7    350)—the party seeking certification must prove, by a preponderance of the evidence, that they

8    are established.  *Olean v. Bumble Bee*, 31 F.4th 651, 665 (9th Cir. 2022).

9          If Plaintiffs "establish[ ] all four of the 23(a) elements, [they] must then satisfy one of the

10   three requirements of Rule 23(b)."  *Civ. Rts. Ctr. v. Hospitality Props.*, 867 F.3d 1093, 1103 (9th

11   Cir. 2017).  Here, Plaintiffs seek class certification under Rule 26(b)(3) (Dkt. 124 at 20), which

12   requires a finding "that the questions of law or fact common to class members predominate over

13   any questions affecting only individual members, and that a class action is superior to other

14   available methods for fairly and efficiently adjudicating the controversy."  This predominance test

15   is "'far more demanding' than the commonality test under Rule 23(a)(2)," *AdTrader v. Google*,

16   2020 WL 1922579, at *15 (N.D. Cal. Mar. 24, 2020) (quoting *Amchem Prods. v. Windsor*, 521

17   U.S. 591, 624 (1997)), and "asks whether the common, aggregation-enabling, issues in the case

18   are more prevalent or important than the non-common, aggregation-defeating, individual issues."

19   *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

20         Plaintiffs also seek, in the alternative, to certify a "liability only" class under Rule 26(c)(4)

21   that pertains "solely [to] the questions of whether Apple made material misrepresentations

22   regarding storage capacity to the Class[.]"  Mot. at 35:12-13.  However, a "Rule 23(c)(4) issues

23   class must still meet the requirements of Rule 23(a) and (b) (except for the predominance

24   requirement of Rule 23(b)(3))."  *Handloser v. HCL Techs.*, 2021 WL 879802, at *12 (N.D. Cal.

25   Mar. 9, 2021) (quoting *Tasion Commc'ns v. Ubiquiti Networks*, 308 F.R.D. 630, 633 (N.D. Cal.

26

27   Locked" (which requires entering the password for the device's affiliated Apple ID to access it).
     *Id.* ¶ 19.  The parties' counsel then engaged in a back-and-forth process to remove the Activation
     Lock.  On March 11, 2022, Plaintiffs' counsel stated that the Activation Lock had been removed,
28   attaching an image of the iPhone 5's screen.  *Id.* ¶ 20.  That screenshot indicates that Neocleous's
     iPhone 5 has been wiped.  Tenhunen Dec. ¶¶ 7-8.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1    2015)).  And even then, issue certification under Rule 26(c)(4) still "requires that common

2    questions predominate over individual questions with respect to only the specific issue that is

3    certified."  *Stickles v. Atria Senior Living*, 2021 WL 6117702, at *7 (N.D. Cal. Dec. 27, 2021)

4    (citing *Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234 (9th Cir 1996)); *Reitman v. Champion*

5    *Petfoods USA*, 830 F. App'x 880, 882 (9th Cir. 2020).

6    **IV.    CERTIFICATION OF ANY CLASS IS IMPROPER**

7         Plaintiffs seek to certify the Preinstall Subclass and Upgrade Subclass on a nationwide

8    basis.  Not only are nationwide classes improper because California law does not apply to any of

9    the named plaintiffs' claims (or claims by any other non-California residents in the putative

10   class), there is no basis to certify any class at all.  Answering the key questions in this case—

11   namely, whether Apple's alleged failure to state that iOS 8 occupied 2-3GB of space was material

12   to a given consumer's purchase/upgrade decision and whether they were thereby "injured" due to

13   that purchase/upgrade—necessarily turns on each consumer's individual circumstances.  And as

14   set out below, Plaintiffs are neither adequate nor typical representatives.

15        **A.    No "Common" Issues**

16        To certify one or more of their three causes of action for violations of California's UCL,

17   FAL, or CLRA, Plaintiffs need to show—with common evidence—that Apple's challenged

18   conduct was (i) material to consumers' decisions to upgrade 16GB iOS devices to iOS 8, and/or

19   to purchase 16GB iOS devices with iOS 8 preinstalled, and (ii) caused economic injury.

20   Plaintiffs miss those points entirely, and they cannot make that showing.

21        Plaintiffs assert that Rule 23(a)'s "commonality" requirement is fulfilled because "this

22   case presents numerous common questions of law or fact"—including, *inter alia*, (a) whether

23   Apple's statements at issue were material to reasonable consumers; and (b) whether Plaintiffs

24   (and other members of the putative class) are entitled to damages.[16]  Mot. at 16:5, 17:6.

25   _____

[16] The other "common questions" listed in Plaintiffs' Motion are derivative of these two.  For
26   example, while Plaintiffs list "[w]hether Apple's representations and omissions were untrue,
     misleading, or reasonably likely to deceive a reasonable consumer" and "[w]hether a reasonable
     consumer understood that 16GB was not actually available for their own use based on the
27   Devices' labeling, packaging and marketing" as common questions (Mot. at 16:16-19), either can
     only be answered on a classwide basis if Apple's conduct at issue was material.  Plaintiffs also
28   claim that "[w]hether Apple knew or failed to take reasonable steps to determine its
     representations and/or omissions were false or misleading," "[w]hether Apple's partial disclosure

APPLE'S OPP. TO MOT. FOR CLASS CERT.
                                                             NO. 5:14-CV-05659-EJD

1    According to Plaintiffs, because "these common issues would be uniformly applied to all [c]lass

2    [m]embers," Rule 23(a)(2)'s commonality requirement is met.  *Id.* at 17:7-11 (citing

3    *Krommenhock v. Post Foods*, 334 F.R.D. 552, 562-63 (N.D. Cal. 2020); *Farar v. Bayer AG*, 2017

4    WL 5952876, at *5 (N.D. Cal. Nov. 15, 2017)).  That is not correct.  Although Plaintiffs list many

5    supposed "common questions," "[w]hat matters to class certification ... is not the raising of

6    common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to

7    generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the

8    proposed class are what have the potential to impede the generation of common answers." *Dukes*,

9    564 U.S. at 350 (emphasis in original); *see also Olean*, 31 F.4th at 663 (quoting *Dukes*, 564 U.S.

10   at 350).[17]  Plaintiffs' common *questions* of materiality and injury are not susceptible to common

11   *answers* because of dissimilarities that vary across the proposed classes.

12          Whether a misrepresentation is "material" to reasonable consumers is a key question for

13   certifying a class under the UCL, FAL, and CLRA.  *Otto v. Abbott Labs.*, 2015 WL 9698992, at

14   *5 (C.D. Cal. Sept. 29, 2015) ("For purposes of class certification, the UCL, FAL, and CLRA are

15   materially indistinguishable.... Under each statute, a Plaintiff may establish the required elements

16   of reliance, causation, and damages by proving that Defendant[ ] made what a reasonable person

17   would consider a material misrepresentation."); *see also Archie v. Pop Warner Little Scholars*,

18   2019 WL 4439493, at *3 (C.D. Cal. Sept. 11, 2019) (materiality needed for UCL and FAL class

19   claims); *Mass. Mut. Life Ins. Co. v. Superior Ct.*, 97 Cal. App. 4th 1282, 1292 (2002) (materiality

20   needed for CLRA class claims).  Where materiality varies from consumer to consumer, class

21   certification is improper.  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009) ("[I]f the

22   issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue

23   is not subject to common proof, and the action is properly not certified as a class action.");

24   _____

25   as to the Devices' storage capacity created a duty to disclose," and whether Apple violated the
     UCL, FAL, or CLRA present common questions (*id.* at 16:20-17:7), but they, too, necessarily
     depend on whether Apple's "16GB" representation was material to consumers.  Finally,

26   "[w]hether the Plaintiffs and the Class overpaid for the Devices" can only present a common
     question if damages can be calculated on a classwide basis.

27   [17] Plaintiffs do not show otherwise—in fact, the *Farar* case that Plaintiffs cite makes the same
     point.  *Farar*, 2017 WL 5952876, at *5 (quoting *Dukes*, 564 U.S. at 350) ("The plaintiff must

28   demonstrate not merely the existence of a common question, but rather 'the capacity of classwide
     proceedings to generate common answers apt to drive the resolution of the litigation.'")).

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1    *Stearns v. Ticketmaster*, 655 F.3d 1013, 1022-23 (9th Cir. 2011) (quoting *Vioxx*, 180 Cal. App.

2    4th at 129), *recognized as abrogated on other grounds*, *Jabbari v. Farmer*, 965 F.3d 1001, 1008

3    (9th Cir. 2020) (same).  That is the case here: since "the issue of materiality … is a matter that

4    would vary from consumer to consumer," a class action cannot be properly certified.  *Vioxx*, 180

5    Cal. App. 4th at 129.

6          **1.**      **Apple's Alleged Misrepresentation Is Not "Material" Because**
                         **Consumers Would Have Made the Same Purchase/Upgrade Decisions**

7           By definition, an alleged omission or misrepresentation cannot be material when, even

8    without it, the complaining party would have acted the same.  *See, e.g.*, *Mass. Mut.*, 97 Cal. App.

9    4th at 1294 (quoting *Caro v. Procter & Gamble*, 18 Cal. App. 4th 644, 668 (1993)) ("materiality

10   means that without the misrepresentation, the plaintiff would not have acted as he did"); *Vioxx*,

11   180 Cal. App. 4th at 129 ("a representation is considered material if it induced the consumer to

12   alter his position to his detriment").  Plaintiffs claim that materiality presents a "common

13   question" because it is assessed in terms of a "reasonable consumer" (Mot. at 16:15), but the

14   "reasonable consumer" standard does not always mean that materiality is demonstrable through

15   common proof.  In *Turcios v. Carma Labs.*, 296 F.R.D. 638 (C.D. Cal. 2014), for example, the

16   Court assessed materiality in terms of a "reasonable man" but found it was not subject to common

17   proof due to the defendant's "persuasive evidence that materiality ... is an individualized

18   question," including the fact that the defendant's "evidence show[ed] that some consumers were

19   aware of the particular dimensions and design of the Carmex Green Jar, and continued to

20   purchase the lip balm."  *See also Johnson v. Harley-Davidson, LLC*, 285 F.R.D. 573, 581 (E.D.

21   Cal. 2012) (materiality not subject to common proof, noting that "while materiality is generally

22   determined by the 'reasonable consumer standard,' there are numerous individualized issues as to

23   whether the reasonable consumer purchasing one of Defendants' motorcycles would find the

24   excessive heat material" including defendant's "evidence that the excessive heat would not be

25   material to many of their consumers" and that "[e]ven the former named plaintiffs, knowing that

26   the motorcycles cause excessive heat, would still buy and recommend the[m]"); *Algarin v.*

27   *Maybelline*, 300 F.R.D. 444, 454, 457 (S.D. Cal. 2014) (materiality "varie[d] from consumer to

28   consumer" despite reasonable consumer standard); *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502

1   (C.D. Cal. 2011) ("Defendants have put forth persuasive evidence that materiality ... would vary

2   from consumer to consumer, such that the reasonable consumer standard cannot be applied.").

3         That is the case here.  Plaintiffs provide no classwide evidence—let alone classwide

4   evidence sufficient to meet the preponderance standard—that class members would have made

5   different purchase/upgrade decisions had they been told that iOS 8 would occupy space.  Both of

6   Plaintiffs' experts admitted they did not evaluate whether customer behavior would have

7   changed.  PD Exs. I at 124:20-125:4, P at 109:25-110:15, 127:8-128:25.  And all of the other

8   available evidence shows that materiality (*i.e.*, whether class members would have made different

9   purchase/upgrade decisions had Apple expressly stated that iOS occupies 2-3 GB of storage

10  space) is an individualized question.  *See, e.g.*, *McVicar v. Goodman*, 2015 WL 4945730, at *12

11  (C.D. Cal. Aug. 20, 2015) (materiality subject to individualized proof where survey showed that

12  "consumers would not have changed their behavior if they had been confronted with a disclosure

13  regarding the [information]").  As shown in Butler's survey (the only one to actually ask the

14  relevant question), for consumers who did not know that iOS 8 occupies storage space, their

15  responses to being informed that iOS 8 occupies 2-3GB of storage space vary considerably:

16  11.3% of iPhone users would buy from another manufacturer, 4.5% would not buy any device,

17  15.8% could not say for sure whether they would have done anything differently, 39% would buy

18  the same device, and 27.6% would have decided to buy *more expensive* Apple devices with larger

19  storage capacities (iPad users gave similar answers).  Butler Rpt. Table 13, 14.  And Apple's

20  alleged conduct was not material for many class members—approximately 70%, per Butler's

21  survey (*id.* ¶ 81)—who *already knew* iOS 8 occupied at least some storage space before

22  purchasing/upgrading their devices, and did so anyway.  And class members would have learned

23  that information from a variety of Apple and non-Apple information sources, such as the Upgrade

24  Screens where Apple told consumers how much additional data iOS updates required; press

25  reports explicitly discussing the size of iOS 8 (and the space needed to perform the installation);

26  and the fact that many other computers, tablets, and smartphones (

27  ) have operating systems that use space.  Again, even the

28  named Plaintiffs (a) admitted that they may have bought or upgraded anyway, and (b) continued

1  to buy/upgrade even after suing Apple. In short, the evidence is overwhelming that (1) the

2  alleged "misrepresentations" and "omissions" here (*i.e.*, "16GB" or the "failure" state that iOS 8

3  used space) were not material to many (if not virtually all) class members, and (2) determining

4  materiality will depend on customer-specific facts, including their experience with Apple and

5  other devices, what Apple told each consumer, and that consumer's data storage needs. *See, e.g.,*

6  *Grodzitsky v. Am. Honda*, 957 F.3d 979, 986-87 (9th Cir. 2020) (affirming certification denial

7  where plaintiff's expert's testimony regarding commonality was unreliable, and plaintiff pointed

8  to no other common evidence to satisfy the commonality requirement).

9          **2.**    **The Fact of Injury Is Not Subject to Common Proof**

10        For similar reasons, the answer to Plaintiffs' final question—whether consumers are

11  entitled to damages—necessarily changes from consumer to consumer. *First*, any consumer who

12  knew how much space iOS 8 would occupy, and upgraded/purchased anyway, got what they

13  expected and cannot have been injured. McCrary Rpt. ¶ 26.

14  

15                                  ; *see Algarin*, 300 F.R.D. at 454, 457 ("it

16  sounds in common sense that making repeat purchases indicates that the customer's expectations

17  have been met"),

18  

19                        . Whether a given class member was injured would also turn

20  on whether they knew that iOS 8 occupied space for other reasons (*see* Sections II.B and

21  IV.A.1).[18] Each named plaintiff is an example of such non-injury, as they purchased or upgraded

22  16GB iOS devices with full knowledge of iOS 8's size: Endara and Neocleous bought 16GB

23  iPhone 6's running iOS 8, and Orshan upgraded his 16GB iPad to iOS 8, all *after* suing Apple.

24        *Second*, any consumer who did not know iOS 8 occupied space, but whose purchase/

25  upgrade behavior would not have changed even after being told that iOS occupies 2-3GB, is also

26  _____

27  [18] Plaintiffs' reliance on *McCrary v. Elations Co.*, 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13, 2014) (Mot. at 19:5-7), is therefore readily distinguishable. Whereas *McCrary* found that consumers' post-purchase satisfaction did not preclude the possibility they were injured by being

28  misled into purchasing the product, individualized evidence in this case bears on what consumers knew *before* purchase, and therefore whether they could have been misled in the first place.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1    uninjured.  *See, e.g.*, *Boysen v. Walgreen*, 2012 WL 2953069, at *7 (N.D. Cal. July 19, 2012) (no

2    injury where plaintiff "does not allege that had defendant's juice been differently labeled, he

3    would have purchased an alternative juice"); *Nguyen v. Medora Holdings*, 2015 WL 4932836, at

4    *6 (N.D. Cal. Aug. 18, 2015) (no Article III standing where Plaintiffs "have made no showing

5    that ... they would not have purchased the product had they known about the alleged

6    misbranding"); McCrary Rpt. ¶ 30.  Again, such individuals comprise a sizeable proportion of the

7    class.  *See* Butler Rpt. Tables 13-14 (38.8% (iPad) - 39% (iPhone) would've purchased anyway).

8        **Third**, consumers who never ran out of storage capacity (or came close to it) were also

9    uninjured.  *Moore v. Apple*, 309 F.R.D. 532, 542-43 (N.D. Cal. 2015) (denying certification of

10   UCL claim where "the question of whether an individual class member actually experienced a

11   disruption in text messaging services, and whether that disruption was caused by iMessage is not

12   subject to common proof and will require individual inquiries"); *Estrada v. Johnson & Johnson*,

13   2015 WL 1440466, at *4 (E.D. Cal. Mar. 27, 2015) (cannot claim price premium where plaintiff

14   "received all of the intended benefits of the bargain"); *see Lassen v. Nissan N. Am.*, 211 F. Supp.

15   3d 1267, 1280 (C.D. Cal. 2016) ("that other people were injured does not establish any

16   particularized injury as to *these* Plaintiffs") (emphasis in original); McCrary Rpt. ¶ 31.  If iOS 8

17   never caused a given consumer to run out of space (or come close to it), they got the full benefit

18   of the ownership experience that they expected and therefore were never harmed.  *Id.*; *Chow v.

19   Neutrogena*, 2013 WL 5629777, at *2 (C.D. Cal. Jan. 22, 2013) (classes "unmanageable" where

20   class definitions "do not exclude those uninjured class members for whom the product provided

21   the advertised benefits").  Here, it is not possible to narrow the class to only include consumers

22   who used all or most of their storage space, because consumers' storage use cannot be measured

23   on a classwide basis.   Indeed, only one named plaintiff was able to determine how much space he

24   used on his devices—Endara, who had "6.9GB [ ] available" roughly a week and a half before he

25   sued Apple.  PD Ex. X at p.7.[19]

26       **Fourth**, any member of the Preinstall Subclass who realized iOS 8 occupied storage space

27

28   ---

[19] Because none of the named plaintiffs was able to state how much storage space he had
available (PD Exs. U at p. 6, V at p. 6; W at p. 5), as discussed in Apple's anticipated sanctions
motion, they should be precluded from arguing that they filled their storage space.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1   once they bought their device cannot be injured because they were allowed to return their devices

2   under Apple's 14-day return policy.  McCrary Rpt. ¶ 35.  Any unhappy class member who could

3   have received a refund, or exchanged their device for a higher-capacity one, has not been harmed.

4   *Gonzales v. Comcast*, 2012 WL 10621, at *8 (E.D. Cal. Jan. 3, 2012) (full refund for alleged

5   overbilling precluded Article III standing to pursue UCL and CLRA claims); *see also Davis v.*

6   *HSBC Bank Nev.*, 691 F.3d 1152, 1170 (9th Cir. 2012) (affirming dismissal of UCL claims

7   "because [plaintiff] refused to cancel his card within 90 days, even when viewing the facts in

8   Davis's favor, we must conclude that any harm he suffered was the product of his own behavior,

9   not the advertisements"); *Herron v. Best Buy*, 924 F. Supp. 2d 1161, 1178 (E.D. Cal. 2013)

10  ("Plaintiff refused to return his Laptop for a full refund, his harm was avoidable, and likely any

11  harm he suffered was the product of his own behavior, rather than Best Buy's actions.").

12          **Fifth**, for similar reasons, any member of the Upgrade Class who chose not to downgrade

13  back to iOS 7 has not been harmed either.  McCrary Rpt. ¶ 36, n.52.

14          **Finally**, any class member who purchased their device for reasons unrelated to Apple's

15  "16GB" representation cannot have been injured by Apple's alleged conduct.  *See, e.g.*, *Chow*,

16  2013 WL 5629777, at *2 ("Plaintiff has not provided significant proof to distinguish between

17  mere favorability toward products bearing the Neutrogena brand name, for example, and reliance

18  upon specific advertised benefits of the products in this case.").  Endara, for example, bought his

19  iPhone 6 for reasons that had nothing to do with iOS 8.  And Plaintiffs all kept buying Apple

20  products, even after suing Apple.  Neocleous Tr. at 151:18-152:6; Orshan Tr. at 105:20-106:15;

21  Endara Tr. at 67:23-68:2, 182:24-183:17.

22          This case is not a matter of having constant liability across the class, with variation only in

23  the amount due to class members.  *Compare with Villalpando v. Exel Direct*, 2016 WL 1598663,

24  at *5 (N.D. Cal. Apr. 21, 2016).  Here, the *fact* of injury and damage, not just the *amount*, turns

25  on the individualized questions discussed above.  Because common evidence cannot prove that a

26  given consumer was injured *at all*, certification must be denied.  *Olean,* 31 F. 4th at 699 n.14; *see*

27  *Arthur v. United Indus.*, 2018 WL 2276636, at *6 (C.D. Cal. May 17, 2018) (denying certification

28  due to failure "to demonstrate that the [ ] class includes only those individuals who were actually

20

1    injured"); *McKinnon v. Dollar Thrifty*, 2015 WL 4537957, at *9 (N.D. Cal. July 27, 2015)

2    (denying certification were "Plaintiffs' class definition [ ] includes individuals who were not

3    injured because they were not deceived or because they benefited from the additional coverage").

### B.    Individual Issues Will Predominate Under Rule 23(b)(3)

5        "The predominance inquiry asks whether the common, aggregation-enabling, issues in the

6    case are more prevalent or important than the non-common, aggregation-defeating, individual

7    issues." *Olean*, 31 F.4th at 664 (quoting *Tyson Foods*, 577 U.S. at 453).  And "[i]n making the

8    determinations necessary to find that the prerequisites of Rule 23(b)(3) are satisfied, the district

9    court must proceed just as the judge would resolve a dispute about any other threshold

10   prerequisite for continuing a lawsuit.  This means that the court must make a rigorous assessment

11   of the available evidence and the method or methods by which plaintiffs propose to use the

12   [classwide] evidence to prove the common question in one stroke." *Id.* at 666.[20]  As discussed

13   below, whether Apple's challenged conduct (*i.e.*, its supposed failure to state that iOS 8 would

14   occupy storage space) was material, and whether consumers were "injured" because of it will

15   depend on individualized facts.

### 1.    Individualized Issues Predominate Determinations of "Materiality"

17       As discussed above, Plaintiffs cannot certify classes in relation to their UCL, FAL, or

18   CLRA claims unless they can show, with classwide evidence, that Apple's purported failure to

19   state that iOS 8 would occupy storage space was material to class members' purchase/upgrade

20   decisions.  But in this case, determining whether Apple's failure to state that was material to a

21   given class member necessarily turns on individual circumstances.  *See In re Hyundai & Kia Fuel*

22   *Economy Litig.*, 926 F.3d 539, 560 (9th Cir. 2019) (en banc)) (main concern under subsection

23   (b)(3) is "the balance between individual and common issues").  None of the classwide evidence

24   Plaintiffs cite in their brief (*e.g.*, that Apple included a "16GB" statement on the devices at issue,

25   that iOS 8 occupied 2-3GB of space, and that Apple's website and packaging also included the

---

26   [20] In *Tyson Foods*, for example, the Supreme Court held that if class members had pursued
     individual lawsuits, each could have relied on their expert evidence purporting to show how long
27   it took to apply and remove protective equipment—even though a given jury might not find that
     evidence persuasive, it was capable of answering a common question for the entire class in one
28   stroke and could have reasonably sustained a verdict in plaintiffs' favor.  *Olean*, 31 F.4th at 668
     (citing *Tyson Foods*, 577 U.S. at 456-57).

APPLE'S OPP. TO MOT. FOR CLASS CERT.
                                                   NO. 5:14-CV-05659-EJD

1    statement "actual formatted capacity less") can determine the materiality of Apple's alleged

2    conduct.  Instead, as set out above, whether consumers were *actually, materially misled* depends

3    on evidence that varies from consumer to consumer, such as whether a given class member had

4    seen any of Apple's Upgrade Screens before their purchase/upgrade.  *See* Sections II.B, IV.A.1.

5    As Plaintiffs' expert Larry Londre admitted in deposition, numerous factors influence a purchase

6    decision.[21]  In fact, the predominance of individual issues is perhaps best illustrated by the named

7    Plaintiffs' own circumstances: any trial on their claims would revolve around, *inter alia*, their

8    exposure to Upgrade Screens, history with iOS devices, and their post-lawsuit decisions to

9    continue buying/upgrading iPhones with iOS 8 (not to mention the credibility issues raised by

10   their false statements).[22]

11        The law is clear that no class can be certified where, as here, class members were exposed

12   to different information that would impact their understanding of challenged statements.  In

13   *Pierce-Nunes v. Toshiba*, for example, the court denied class certification based on Toshiba's

14   evidence that "many consumers would have learned about LED TVs based on information from

15   Defendants, other manufacturers, retailers, third-parties, and media made freely available,"

16   concluding that even "assuming that each class member may have been exposed to the LED TV

17   label [at issue], [plaintiff] will not be able to demonstrate with common proof, even under a

18   reasonable consumer standard, that each class member had the same understanding of the product

19   labeling[.]"  2016 WL 5920345, at *7 (C.D. Cal. June 23, 2016).  Similarly in *Berger v. Home

20   Depot*, the Ninth Circuit affirmed a trial court's denial of class certification under Rule 23(b)

21   because, even though all members of a given subclass had seen the same contract, the fact that

22   some stores had signs informing consumers that the challenged contractual terms were optional

23   (and store employees may have provided oral notice of that fact) necessarily meant that each

---

24   [21] Londre Tr. at 171:20-172:2 ("[T]hey can go to the website. They can be influenced by the
     salesperson. They can be influenced by the merchandising in store.... They could be influenced by
25   a family member. They can be influenced in the friends and family that are part of the -- it's kind
     of negative e-mails, but there are product reviews.").

26   [22] *See, e.g.*, *Faulk v. Sears*, 2013 WL 1703378, at *9 (N.D. Cal. Apr. 19, 2013) (individual issues
     predominate where "Faulk's own tire purchase history and deposition testimony cast doubt on
27   whether Faulk himself found the alleged omissions material. That Faulk continued to purchase
     Sears tires and the Road Hazard Plus warranty even after he became aware of Sears' allegedly
28   unlawful policy to deny warranty coverage shows, at least as to the Named Plaintiff, materiality
     may not be susceptible to proof by objective criteria.").

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1    consumer's claims turned on individual facts.  741 F.3d 1061, 1069-70 (9th Cir. 2014), *abrogated*

2    *on other grounds*, *Microsoft v. Baker*, 137 S. Ct. 1702, 1712 (2017).  Here, like *Toshiba* and

3    *Berger*, even if all consumers were exposed to the "16GB" statement, any given consumer's

4    unique, preexisting knowledge impacted how they interpreted it—many already understood that

5    iOS 8 would use part of the 16GB, and others (*e.g.*, Endara) did not rely on it at all.

### 2. Individualized Issues Will Predominate as to Injury

7         In order to certify a class under Rule 23(b)(3), Plaintiffs must also be able to show that

8    classwide damages can be measured through a model that "measure[s] damages resulting from

9    the particular [ ] injury on which petitioners' liability ... is premised."  *Comcast v. Behrend*, 569

10   U.S. 27, 35-36 (2013).  Plaintiffs contend that standard is met because damages can purportedly

11   "be determined on a class-wide basis by a formulaic calculation of the price premium Plaintiffs

12   paid for storage capacity they did not receive."  Mot. at 28:20-29:10.  According to Plaintiffs'

13   expert, Dr. Groehn, this "price premium" is determined by calculating the "implicit price" of each

14   GB at issue (*id*. at 14:6-9), which in turn requires dividing the difference between the price of a

15   given consumer's device at issue and that of the device's next-highest tier (*e.g.*, a $100 price

16   difference between the 16GB iPhone 6 and 64GB iPhone 6) by the additional storage capacity

17   that tier would provide (*e.g.*, 48GB).  *Id*. at 14:12-14.  Plaintiffs would award every class member

18   the full amount of this "price premium," because but for Apple's challenged conduct they "would

19   not have purchased the Devices, or would have paid significantly less for them." *See, e.g.*, Compl.

20   ¶ 77.  However, Plaintiffs' methodology fails to account for the individualized issues driving both

21   the *fact* of injury, and the *extent* of injury, for a given class member.

22        ***First***, to certify a class under Rule 23(b)(3), Plaintiffs must show that they can prove the

23   *fact* of damage for each class member using classwide evidence.[23]  Although the Ninth Circuit's

---

[23] *Olean*, 31 F.4th at 668 ("When individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions."); *id.* at 669 n.14 (citing *In re Asacol Antitrust Litig.*, 907 F.3d 42, 55-58 (1st Cir. 2018)) (class failed Rule 23(b)(3) where evidence showed that thousands of plaintiffs who were loyal to brand-name drugs would not have purchased the generic drugs that were subject of price-fixing conspiracy); *Mazza v. Am. Honda*, 666 F.3d 581, 596 (9th Cir. 2012) (class definition fatally overbroad where many members learned the advertising was misleading before purchase or had never been exposed to the allegedly misleading advertisements).

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1    recent decision in *Olean* does not automatically preclude certifying classes that "potentially

2    include[ ] more than a de minimis number of uninjured class members" (31 F.4th at 669), it also

3    cautions that "[w]hen 'a class is defined so broadly as to include a great number of members who

4    for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the

5    class is defined too broadly to permit certification.'" *Id.* at 669 n.14 (quoting *Messner v.*

6    *Northshore Univ.*, 669 F.3d 802, 824 (7th Cir. 2012)).  Creating a "fail safe" class defined to only

7    include injured individuals is also prohibited.  *Id.*

8           Groehn's model cannot confirm the fact of damage for a given class member because it

9    makes no effort to do so—it simply assumes, without support, that every class member has

10   already been injured.  McCrary Rpt. ¶ 22; Groehn Tr. at 110:10-15.  And while Groehn tries to

11   sidestep that fact by contending that every purchaser was inherently injured "because the market

12   price of the product was higher than it would have been had all consumers had the correct

13   information" (*id.* at 92:16-18; *see also id.* 121:4-10), he did not measure whether Apple's price or

14   consumer demand would have actually changed in light of an express disclosure that iOS 8

15   occupied 2-3GB of space.[24]  Furthermore, Plaintiffs' "price inflation" damages theory improperly

16   attempts to apply a securities-suit damages theory in a consumer products context.  *See In re*

17   *POM Wonderful*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) ("Frauds on the market are

18   only possible in efficient markets, where the price of (in most cases) a stock is determined by

19   openly disseminated information about a business."); *see also Junge v. Geron*, 2022 WL

20   1002446, at *4 (N.D. Cal. Apr. 22, 2022) ("To establish a 'fraud-on-the-market' presumption of

21   reliance, lead plaintiffs must show that they traded in a market that was at all relevant times

22   'efficient'").  Indeed, California does not recognize this damages theory in the consumer context.

23   *See, e.g.*, *POM Wonderful*, 2014 WL 1225184, at *3-4 (court is not "aware of any authority

24   applying a fraud on the market theory to a consumer action"); *Gartin v. S&M NuTec*, 245 F.R.D.

25   429, 438 (C.D. Cal. 2007) (rejecting class premised on fraud on the market theory).

26          Here, the record shows that many (if not most) consumers cannot have been injured

27   ───────────────
     [24] Groehn Tr. at 124:13-21 ("Q Is it your testimony that in the real world, if Apple had made more
28   fulsome disclosures about the storage capacity used by iOS 8, that Apple would have had to lower
     its prices for the class devices? [Objection] [A] I don't know how Apple would have reacted
     ….."), 127:8-128:25.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
                                              NO. 5:14-CV-05659-EJD

1  because they already knew that iOS 8 occupied space (*see* Section IV.A), and determining

2  whether a given consumer could have been injured requires a case-by-case inquiry.  Consumers

3  who bought/upgraded their devices knowing that iOS 8 took up space (or who would have

4  bought/upgraded), for example, got the benefits they expected and have no possible injury.

5  McCrary Rpt. ¶ 30; *Johnson*, 285 F.R.D. at 581; *Turcios*, 296 F.R.D. at 646; *Sevidal v. Target*

6  *Corp.*, 189 Cal. App. 4th 905, 924 (2010) ("Even after the *Tobacco II* decision, the UCL and FAL

7  still require some connection between the defendant's alleged improper conduct and the unnamed

8  class members who seek restitutionary relief.").  And as discussed in Section IV.A.1, determining

9  whether a given consumer had such knowledge depends on individual facts (*e.g.*, exposure to

10  Apple's Upgrade Screens, media articles, and prior ownership experience).  Groehn's failure to

11  even attempt to grapple with these issues causes his proposed "methodology" to lead to absurd

12  results—under Groehn's model, for example, Endara and Neocleous would be "injured" (and

13  entitled to full compensation) for 16GB iOS 8 devices that they bought *after suing Apple.*

14       ***Second***, even regarding those consumers who were somehow injured, Rule 23(b)(3) is

15  still not met because Groehn's methodology fails to actually calculate the *extent* of that damage

16  (*i.e.*, "translat[e] ... the *legal theory of the harmful event* into an analysis of the economic impact

17  *of that event*").  *Comcast*, 569 U.S. at 38 (emphasis in original).  The "implicit price" that

18  Groehn's damages model calculates is arbitrary.  Specifically, Groehn's "implicit prices" are "not

19  tethered to any economic fundamentals related to [the] disclosure" at issue (McCrary Rpt. ¶ 54),

20  and are "fundamentally unreliable."  *Id.* ¶ 63. The "implicit price" that Groehn's "model"

21  calculates varies wildly,[25] and reflects the device he chooses as a point of comparison, not the at-

22  issue "class device." *Id.* ¶ 69.[26]

---

23  [25] The "implicit price" that Groen's model calculates varies by 300% ($2.08-$6.25 per GB) across
device and time period.  Dkt. 124-31 at p. 34 (Table 4); McCrary Rpt. ¶ 55 .  For example,
24  Groehn calculates an implicit price of $6.25/GB for the "WiFi+Cellular" iPad Mini 3, but an
implicit price of only 1/3 that amount—$2.08—for the "WiFi Only" model, even though the lack
25  of a cell connection would suggest that on-device storage would be even more important.
[26] Although Plaintiffs claim that courts "frequently certify classes based on a similar damages
26  methodology," the sole case they cite, *Carlotti v. ASUS*, provides no support for Groehn's
approach.  *See* Mot. at 30:3-4 (citing 2019 WL 6134910, at *6 (N.D. Cal. Nov. 19, 2019)).
27  *Carlotti* settled as a result of mediation, with "no briefing ... for class certification" (*id.* at *2).  It
did not rigorously assess the validity of this damages model, and instead merely reiterated class
28  counsel's description of the damages approach.  *Id.* at *6.  Indeed, as plaintiffs' counsel conceded
in their request to approve the class settlement, proceeding with litigation would have posed

*Third*, Groehn's model also fails because it assumes that each class member is entitled to compensation for the full 2-3GB that iOS 8 occupied.  *See* Dkt. 124-30 Table 3, ¶ 70; McCrary Rpt. ¶¶ 45-46.  But that assumption only holds for consumers who believed iOS 8 would not occupy *any* space (and therefore could theoretically be entitled to compensation for the full 2-3GB it took up).  *Id.*  Again, approximately 70% of class members knew that iOS 8 used some of their device's hard drive (Butler Rpt. ¶ 81, Table 10), and many class members were explicitly told that downloading iOS 8 would require another ~1GB of space when clicking through Upgrade Screens.  Still others only used ~0.5GB of more space in upgrading from iOS 7 to iOS 8.  Harmon Dec. Ex. A.  Yet Groehn's model would compensate them all for the full 2-3GB, and makes no attempt to reflect the difference between how much space a given class member anticipated iOS 8 would occupy and how much space iOS 8 actually used.[27]  Accordingly, Groehn's damages model fails to account for the individual circumstances impacting both the *fact* and *extent* of class members' injury in this case.

## C.    Plaintiffs Are Neither "Typical" nor "Adequate"

### 1.    Plaintiffs Are Not Typical

To satisfy typicality, Plaintiffs must show that they (1) are part of the proposed class, (2) possess the same interest as the class, and (3) suffered the same injury as the class.  *Turcios*, 296 F.R.D. at 647 (quoting *Gen. Tel. v. Falcon*, 457 U.S. 147, 157 (1982)).  Here, all three Plaintiffs admit that Apple's conduct was not material (*i.e.*, had they known iOS 8 used 2-3GB, they would not necessarily have acted differently)—accordingly, they cannot be typical of the class.  *Id.*; *In re NJOY Litig.*, 120 F. Supp. 3d 1050, 1088 (C.D. Cal. 2015) (plaintiff's admission that "he would have purchased NJOY e-cigarettes even if the packaging had disclosed that it contained

---

"risks at class certification," including "the potential inability to prove liability or damages on a class-wide ... basis" and that "there may be difficulties establishing ... that common questions predominate over individual issues[.]"  2019 WL 11793361, at ¶ IV.B.2.c.

[27] *See, e.g.*, *Alvarez v. NBTY*, 331 F.R.D. 416, 426 (S.D. Cal. 2019) ("Even if biotin is essentially snake oil for many people, as Plaintiff presents, a class member ingesting below-average levels of biotin would benefit from the biotin supplement.... What dollar value should the Court place on the benefit that person receives? Plaintiff has not proven that subtracting 1% from each purchase price is adequate to make up for the value of the benefit some class members may receive. Plaintiff therefore has not presented a damages model consistent with her theory of their case, because even under Plaintiff's theory, some people benefitted from the Products. Therefore, damages are not subject to common proof on a class-wide basis. For this reason, predominance is not satisfied.").

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-cv-05659-EJD

1    propylene glycol and glycerin" conceded lack of injury in fact).  And even if any Plaintiff could

2    somehow show an injury (they cannot), typicality would still not be met because they would be

3    subject to unique defenses.  *AdTrader*, 2020 WL 1922579, at *13-14 (quoting *Hanon v.*

4    *Dataproducts*, 976 F.2d 497, 504 (9th Cir. 1992)) ("'class certification should not be granted if

5    there is a danger that absent class members will suffer if their representative is preoccupied with

6    defenses unique to it' because in such cases the representative would not be typical of other class

7    members").  Specifically:

8    •   **Endara**.  At the time he bought his iPhone, Endara had already upgraded his prior iPhone (an

9        iPhone 4S) to iOS 8—and thus seen an Upgrade Screen explaining the practical reality that

10       iOS occupies space.  Endara Tr. at 94:3-5, 139:12-16, 139:17-20.  Endara realized iOS 8 took

11       up space on his iPhone 6 immediately upon purchase, but chose not to return it.  *Id.* at 45:8-

12       17, 54:11-15.  *Even after suing Apple*, Endara bought another 16GB iPhone 6 with iOS 8 (for

13       his son).  And Endara admittedly did not rely on the "16GB" representation (or even look at

14       his iPhone's package) during the purchase process, buying his iPhone 6 solely because he

15       thought it would be faster than his iPhone 4S.

16   •   **Orshan**.  Orshan owned many iOS devices before the one at issue and saw multiple Upgrade

17       Screens when upgrading them. Orshan Tr. at 53:6-14, 56:23-57:14, 87:16-88:3.  After suing

18       Apple, Orshan upgraded his 16GB iPad to iOS 8, and also purchased a 64GB iPhone 6 device

19       with iOS 8 preinstalled.  *Id.* at 104:4-10, 126:9-127:14; O'Neil Dec. ¶¶ 13-14.

20   •   **Neocleous**.  Neocleous' allegations about upgrading to iOS 8 are simply false—he never did

21       so.  And even if Neocleous *had* upgraded to iOS 8 (he did not), his claims would be subject to

22       unique defenses: (1) Neocleous would have seen Upgrade Screens before upgrading to iOS 8,

23       and (2) two months after suing Apple, Neocleous bought a 16GB iPhone 6, with iOS 8

24       preinstalled.  Neocleous Tr. at 100:14-21, 105:4-10, 138:1-12; O'Neil Dec. ¶ 36.

25   In light of these unique defenses, Plaintiffs do not meet the typicality requirement under Rule

26   23(a)(3).  *Ellis v. Costco*, 657 F.3d 970, 984 (9th Cir. 2011) (quoting *Gary Plastic v. Merrill*

27   *Lynch*, 903 F.2d 176, 180 (2d Cir. 1990)) (typicality not met where plaintiff's "unique

28   background and factual situation require[d] him to prepare to meet defenses that [were] not

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1    typical of the defenses which may be raised against other members of the proposed class").

2              **2.       Plaintiffs Are Not Adequate**

3         Class representatives are not "adequate" under Rule 23(a) where their credibility is in

4    question.  *Mendez v. R&L Carriers*, 2012 WL 5868973, at *14 (N.D. Cal. Nov. 19, 2012).  In

5    order "[f]or an assault on the class representative's credibility to succeed, the party mounting the

6    assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's

7    credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of

8    the absent class members' claims."  *Id.* (quoting *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo.

9    1990)).  That standard is met here: Plaintiffs have made multiple false statements and allegations,

10   and their credibility will be a critical issue at trial.  As set out above, each Plaintiff's supporting

11   declarations contain false statements on material issues—including stating (in identical language)

12   that they "would not have purchased the Devices were [they] made aware of the limitations of the

13   operating system and the 16GB capacity"—without mentioning their deposition testimony to the

14   contrary.  Several of the allegations in Plaintiffs' complaint are also demonstrably untrue,

15   including key claims about which devices they purchased, when their iOS 8 updates were

16   installed (and, for Neocleous, the false claim that he ever updated to iOS 8 *at all*).

17        Courts have rejected class certification based on similar conduct.[28]  For example, in *Stotz

18   v. Mophie*, a proposed class representative, Charles, brought claims under the UCL, FAL, and

19   CLRA, alleging that defendant's "Juice Pack" charging devices did not extend battery life as

20   claimed.  2017 WL 11571083, at *1 (C.D. Cal. Dec. 14, 2017).  Although Charles provided the

21   court with "a sworn, signed declaration" stating that he purchased his Juice Pack "from a Best

22   Buy," and made a similar allegation in his complaint, at deposition it was shown that Charles had

23   purchased his Juice Pack from an acquaintance instead.  *Id.* at *15.  Even though he provided a

24   corrected supplemental declaration, the court found him inadequate.  As the court noted, Charles'

---

25   [28] *See, e.g.*, *Savino v. Comput. Credit*, 164 F.3d 81, 87 (7th Cir. 1998) (plaintiff "offered differing
     accounts ... that form the very basis for his lawsuit" and thus "create[d] serious concerns as to his
26   credibility at any trial"); *Kline v. Wolf*, 702 F.2d 400, 401-03 (2d Cir. 1983) (plaintiff testified that
     he had purchased stock at issue in July after reading a report that  had not been issued until
27   August); *Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *6 (S.D.N.Y. Apr. 22, 2019)
     (defendant "presented unrebutted evidence that [representative] could not have purchased
28   Benecol Light in the manner in which she has testified," making her "vulnerable to serious
     attacks on her credibility").

APPLE'S OPP. TO MOT. FOR CLASS CERT.
                                           NO. 5:14-CV-05659-EJD

1   approval of the erroneous complaint and his initial declaration left it "with two possible

2   explanations: 1) that Charles gave his approval to the FAC despite knowing it was factually

3   inaccurate and then deliberately signed a false declaration; or 2) that Charles' inattention to this

4   matter twice caused misrepresentations as to germane matters to be given to the Court." *Id.*

5   Pointing out that "either is disqualifying," the court explained that even if Charles did not

6   purposely mislead the court, he still "allowed a misrepresentation to be given to the Court though

7   nonfeasance and thereafter negligently signed off on a declaration to the Court which repeated the

8   misinformation," thereby "demonstrat[ing] an inadequate appreciation of his duties as a proposed

9   class representative." *Id.* So too here—the credibility issues in this case are more significant, and

10  unlike in *Stotz*, no Plaintiff has filed a corrected declaration.

11           **D.    Certifying a Nationwide Class Would Be Improper**

12          Plaintiffs seek to certify nationwide Preinstall and Upgrade subclasses under California

13  law.  Mot. at 20; *see also* Compl. ¶¶ 55, 63-88.  But Plaintiffs fail to acknowledge, let alone

14  contend with, the Ninth Circuit's decision in *Mazza v. Am. Honda*, 666 F.3d 581 (9th Cir. 2012).

15  While Plaintiffs argue that California law should be applied nationwide because Apple's principal

16  place of business and relevant operations is in California (Mot. at 21), *Mazza* rejected that

17  argument.  *See Mazza*, 666 F.3d at 590 (rejecting application of CA law even though "Honda's

18  corporate headquarters, the advertising agency that produced the allegedly fraudulent

19  misrepresentations, and one fifth of the proposed class members are located in California").  And

20  Plaintiffs' claim that California law applies because the iOS License Agreement "mandate[s] that

21  claims by iOS users be brought under California law" (Mot. at 20-21) fails as well.  Plaintiffs'

22  Motion relies on ¶ 12 of the License, which in operative part states that "[t]his License will be

23  governed by and construed in accordance with the laws of the State of California" and does not

24  require (as Plaintiffs claim) that all claims "by iOS users" be "brought under California law."  *See*

25  https:// www.apple.com/legal/sla/docs/iOS8.pdf.  At any rate, Plaintiffs' claims relate to their

26  purchase/ upgrade decisions, not their use of iOS 8 itself.  Accordingly—as shown by their

27  Complaint's failure to allege a breach of contract claim, or even to discuss the License at all

28  (Compl.)—the License is irrelevant to these claims.

APPLE'S OPP. TO MOT. FOR CLASS CERT.
                                         NO. 5:14-cv-05659-EJD

1    Accordingly, whether a nationwide class can be certified depends on whether there are

2    material differences between California law and the other states' laws that would be at issue.

3    There are.  As *Mazza* held, (i) "material" differences exist between California law and the

4    consumer protection laws of other states, precluding the application of California law nationwide,

5    and (ii) nationwide class certification was improper because the claims of putative class members

6    would necessarily be governed by the laws of all the jurisdictions in which the relevant

7    transactions took place, defeating the predominance requirement.  666 F.3d at 591-94.[29]

8               **1.       Certification Is Improper Where Multiple States' Laws Apply**

9    By definition, Plaintiffs' claims arise under state law and are brought on behalf of putative

10   claimants in all 50 states and the District of Columbia.  A class cannot be certified where, as here,

11   the claims and defenses will be controlled by many states' laws, *Zinser v. Accufix*, 253 F.3d 1180,

12   1189 (9th Cir. 2001) ("differences in state law will compound the disparities among class

13   members from the different states"), and courts regularly refuse to certify nationwide classes

14   where the relevant state laws vary materially.  *E.g.*, *Mazza*, 666 F.3d at 594; *Bonlender v. Am.*

15   *Honda*, 286 F. App'x 414, 414-15 (9th Cir. 2008); *In re Seagate*, 326 F.R.D. 223, 241 (N.D. Cal.

16   2018); *Mullins v. Premier Nutrition*, 2016 WL 3440600, at *5 (N.D. Cal. June 20, 2016).

17              **2.       California's "Governmental Interest" Test**

18   Plaintiffs summarily assert that "[c]hoice of law shows California law should apply

19   nationwide" (Mot. at 20), but completely ignore California's choice of law *rules*, which govern

20   this determination.[30]  Under those rules, "California law may only be used on a classwide basis if

21   'the interests of other states are not found to outweigh California's interest in having its law

22   applied,'" as determined by a three-step "governmental interest" test.  *Mazza*, 666 F.3d at 589-90

23   (quoting *Wash. Mut. Bank v. Superior Ct.*, 24 Cal. 4th 906, 921 (2001)).  Each step in that test is

24   addressed in turn, showing that—based on the facts at hand—other states' interests greatly

25   outweigh California's interest in its own law applying to all putative class members.

26              **a.       States' Consumer Protection Laws Vary in Material Ways**

27   [29] *Mazza* was overruled in part on other grounds (regarding Article III standing for class
     members) by *Olean.*  31 F.4th at 682 n.32 ("We do not overrule *Mazza* as to any other holding").

28   [30] The Court must look to the forum state's choice of law rules to determine applicable state
     substantive law.  *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487 (1941).

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1    The first step considers whether the "law in each potentially concerned state ... materially

2  differs from the law of California." *Wash. Mut.*, 24 Cal. 4th at 919.  The relevant inquiry here is a

3  comparison between Plaintiffs' claims under California's UCL (Count I), FAL (Count II), and

4  CLRA (Count III), and other states' corresponding consumer protection statutes.  As many courts

5  (including in this District) have held, state consumer protection laws vary in material ways,

6  including on: statutes of limitations, scienter, reliance and causation, the availability of class

7  actions, damages, statutory penalties, and punitive damages.  *See, e.g.*, *Mazza*, 666 F.3d at 591

8  (CA and FL state law differences were "not trivial or wholly immaterial" where scienter and

9  reliance requirements, and available remedies, differed); *Cimoli v. Alacer*, 2022 WL 580789, at

10  \*7 (N.D. Cal. Feb. 25, 2022) ("material" differences in scienter and remedies between CA and

11  PA); *Frezza v. Google*, 2013 WL 1736788, at \*6 (N.D. Cal. Apr. 22, 2013) (similar, CA and NC);

12  *Cover v. Windsor Surrey*, 2016 WL 520991, at \*6 (N.D. Cal. Feb. 10, 2016) (similar, CA and

13  RI).[31]  Apple's **Appendix A**, attached hereto, outlines these material state law differences.

14    *First*, applicable statutes of limitations under California law differ substantially from those

15  for other states.[32]  Thus, claims that might be timely here would be barred elsewhere (and vice

16  versa), affecting the substantive rights of consumers to even assert claims in the first instance,

17  based on the state in which they reside.  *See In re Volkswagen*, 349 F. Supp. 3d 881, 920 (N.D.

18  Cal. 2018) ("state statutes of limitations and tolling rules are viewed as substantive not procedural

19  law").  *Second*, California allows class actions, while several states do not.[33]  *Third*, the standards

20  [31] *Davison v. Kia*, 2015 WL 3970502, at \*2 (C.D. Cal. June 29, 2015) ("Courts in this circuit, in
assessing the propriety of nationwide class actions, have held that California's consumer

21  protection statutes are materially different from those in other states.") (collecting cases).
[32] *Compare* **CLRA:** 3 years from date of improper practice (Cal. Civ. Code § 1783); **UCL:** 4

22  years (Cal. Bus. & Prof. Code § 17208); **FAL:** 3 years from discovery of facts constituting fraud
(Cal. Bus. & Prof. Code § 17500; Cal. Civ. Proc. Code § 338(d)); *with, e.g.*, **AL:** 1 year from

23  discovery, but no later than 4 years from transaction date (Ala. Code § 8-19-14); **FL:** 4 years
from date of alleged violation; no "discovery rule" (Fla. Stat. Ann. § 95.11(3)); **ME:** 6 years from

24  discovery (Me. Rev. Stat. Ann. tit. 14, § 752); **NY:** 3 years from alleged violation; no "discovery
rule" (*Gaidon v. Guardian Life Ins.*, 750 N.E.2d 1078, 1084 (N.Y. 2001)); **TX:** 2 years after

25  occurrence or discovery by reasonable diligence (Tex. Bus. & Prof. Code Ann. § 17.565).
[33] *Compare* **CA:** class actions permitted (Cal. Civ. Code § 1780; Cal. Bus. & Prof. Code §§

26  17203, 17535), *with, e.g.*, class actions prohibited in **GA:** Ga. Code Ann. § 10-1-399(a); **LA:** La.
Rev. Stat. Ann. § 51:1409(A); **SC:** S.C. Code Ann. § 39-5-140(a).  Other jurisdictions

27  class action mechanism in more nuanced fashions.  *E.g.*, **FL:** class actions not expressly
permitted or prohibited, but courts decide FDUTPA claims within class action context (*see* Fla.

28  Stat. § 501.202(2); *e.g.*, *Philip Morris v. Hines*, 883 So. 2d 292, 294 (Fla. 4th Dist. Ct. App.
2003)); **NY:** class actions permitted, but class members may not receive more than actual

for the type of misconduct at issue here (*i.e.*, alleged omissions and misrepresentations) varies. For example, "unfair" and deceptive practices are actionable in California, while in other states only "deceptive" practices are actionable.[34]  Relatedly, under the UCL, an omission is only actionable if the defendant had an affirmative duty to disclose.  *Daugherty v. Am. Honda*, 144 Cal. App. 4th 824, 838 (2006).  Yet some states impose such a duty to disclose only when the seller knew or should have known the information,[35] while in other states omissions are simply subject to the same liability standards as other allegedly deceptive or unfair acts.[36]  Moreover, although the UCL and CLRA have no scienter requirement, "many other states' consumer protection statutes do require scienter."  *Mazza*, 666 F.3d at 591.[37]  These differences matter in this case—Plaintiffs will be unable to show that Apple had any intent to mislead.  *See id.* ("In cases where a defendant acted without scienter, a scienter requirement will spell the difference between the success and failure of a claim.").  Similarly, standards for reliance and causation also vary.  In some states, a showing of reliance may be required for each class member,[38] or as is the case in California, a showing of materiality can provide an inference of classwide reliance for UCL, FAL, and CLRA claims.  *Otto*, 2015 WL 9698992, at *5.[39]  But in other states, reliance is not required at all.[40]  As discussed *supra*, the question of materiality (or, by extension, reliance) will be a key issue in this case that turns on each class member's experiences.

Available remedies also differ.  The UCL and FAL, for instance, only allow restitution

---

damages in class action lawsuit (*Burns v. Volkswagen*, 460 N.Y.S. 410, 413 (N.Y. Sup. Ct. 1982))
[34] *Compare, e.g.*, **CA:** Cal. Civ. Code § 1770 ("unfair" **and** deceptive), *and* **FL:** Fla. Stat. Ann. § 501.204(1) (broadly, "unconscionable" acts or practices are actionable), *with, e.g.*, **NY:** N.Y. Gen. Bus. Law §§ 349, 350 (only deceptive or materially misleading acts or practices actionable).
[35] *E.g.*, **MA:** *Nei v. Burley*, 446 N.E.2d 674, 679-80 (Mass. 1983); **NM:** *Richardson Ford Sales v. Johnson*, 676 P.2d 1344, 1347-48 (N.M. Ct. App. 1984).
[36] *E.g.*, **FL:** *Zlotnick v. Premier Sales Grp.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (defining actionable "deception" as "representation, omission, or practice").
[37] *Compare, e.g.*, **AR:** Ark. Code § 4-88-107(a)(1) ("knowingly" false statements of product "benefits"); **CO:** Colo. Rev. Stat. §§ 6-1-105(1)(e), (g), (i), (u) (same); **IA:** Iowa Code § 714H.3(*l*) (scienter required); **WY:** Wyo. Stat. Ann. § 40-12-105 ("knowingly").
[38] *E.g.*, **PA:** *Aronson v. Greenmountain.com*, 809 A.2d 339, 405 (Pa. Super. Ct. 2002) (each member of the class must have justifiably relied on the defendant's representation).
[39] *See Mullins*, 2016 WL 3440600, at *3 ("most states, like the CLRA, require proof of reliance. Thus most states' laws materially conflict with the UCL.").
[40] *E.g.*, reliance not required in **FL:** *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973-74 (Fla. Dist. Ct. App. 2000); **NY:** *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F. Supp. 2d 439, 444-45 (S.D.N.Y. 2005); **MI:** *Dix v. Am. Bankers Life Assur.*, 415 N.W.2d 206, 209 (Mich. 1987) (sufficient to show a reasonable person *would have* relied).

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1   and injunctive relief,[41] but consumers in other states can potentially recover actual, punitive, and

2   sometimes statutory damages, depending on the specific circumstances.[42]  Far from being "trivial

3   or wholly immaterial," *Mazza*, 666 F.3d at 591, these differences (and as further identified in

4   **Appendix A**) materially affect the scope of ***both*** claimant's substantive rights and Apple's due

5   process rights.  They cannot be ignored under *Mazza* and California's choice of law rules.

6            **b.     Each State Has a Strong Interest in Applying Its Own Laws**

7            Since the conflicts of law at issue here are material, the Court must, in the second step of

8   the "governmental interest" test, "determine what interest, if any, each state has in having its ***own***

9   law applied to the case." *Wash. Mut.*, 24 Cal. 4th at 920.  Consumer protection laws reflect

10  important policy judgments by each state about the conduct permitted within its borders, and

11  "each state has a strong interest in applying its own consumer protection laws to [the] transactions

12  [that take place within its borders]"—even if another state's law might be more favorable to

13  consumers.  *Mazza*, 666 F.3d at 591-92.[43]  Plaintiffs ignore this critical choice of law concept—

14  *i.e.*, that the consumer protection laws of the 50 states (inherently invoked by their nationwide

15  class request) reflect ***each*** of those jurisdictions' policy considerations, which should not—and

16  cannot—be overlooked when determining which law to apply (if any) at the class certification

17  stage.  *Lewallen v. Medtronic*, 2002 WL 31300899, at *5 (N.D. Cal. Aug. 28, 2002).[44]

18           **c.     Other States' Interests Would Be Impaired**

19           The last step of the choice-of-law analysis requires the Court to determine "which state's

20  interest would be ***more*** impaired if its policy were subordinated to the policy of the other state."

21  *Mazza*, 666 F.3d at 590; *Wash. Mut.*, 24 Cal. 4th at 920.  Courts do not weigh the worthiness of

22  the respective laws; rather, they decide, "in light of the legal question at issue and the relevant

23  state interests at stake[,] which jurisdiction should be allocated the predominating lawmaking

24
25  [41] Bus. & Prof. Code §§ 17203, 17535; *Korea Supply v. Lockheed*, 29 Cal. 4th 1134, 1144 (2003).
    [42] *Compare, e.g.*, **FL:** remedies limited to damages related to property which was subject of
26  consumer transaction (Fla. Stat. § 501.212(3)); **GA:** treble damages awarded for willful violations
    (Ga. Code Ann. § 10-1-399(c)); **NJ:** treble damages mandatory (N.J. Stat. § 56:8-19); **NY:** treble
27  damages precluded for class actions, but allowed for private actions (N.Y. Gen. Bus. Law § 349).
    [43] *Zinser*, 253 F.3d at 1187 ("every state has an interest in having its law applied to its resident
28  claimants").
    [44] Noting that, with a proposed nationwide class, "each of the fifty states may have an interest in
    seeing that its law is applied in an action involving one of its own injured citizens."

APPLE'S OPP. TO MOT. FOR CLASS CERT.
      NO. 5:14-CV-05659-EJD

1  power under the circumstances" of the case.  *McCann v. Foster Wheeler*, 48 Cal. 4th 68, 97

2  (2010).  Here, almost all of the relevant conduct—as it relates to assessing whether *each* putative

3  class member was "deceived" or "injured"—took place *outside* of California.  Consumers viewed

4  Apple's ads and marketing materials, bought the at-issue devices, and used and upgraded the

5  devices to iOS 8 in their home states.  Rather than acknowledge these fact-specific inquiries,

6  Plaintiffs point to cases that explain—for instance—that relief is available under the UCL and

7  FAL without individualized proof of deception, reliance, and injury.  *See, e.g.*, Mot. at 27

8  (quoting *Martin v. Monsanto*, 2017 WL 1115167, at *6 (C.D. Cal. Mar. 24, 2017)).  But the fact

9  that certain of California's statutes do not require "individualized" proof says *nothing* about the

10  propriety of applying that very law to consumers *in other states*, whose own statutory frameworks

11  might (and often do) require plaintiffs to individually prove deception, reliance, and/or injury as

12  to those claims.  *See* Section IV.D.2.a; App'x A.  Under the third step, the inquiry is precisely

13  whether *those other states'* interests are more impaired if California law were to apply.

14       Crucially (and as Plaintiffs fail to mention), California's choice of law rules recognize that

15  with respect to regulating conduct, "the ***place of the wrong has the predominant interest***."

16  *Mazza*, 666 F.3d at 593.[45]  In misrepresentation cases (such as this one), that means that "the

17  place of the wrong is where the transaction related to the misrepresentation occurred and ***not***

18  where the intention to misrepresent was formed."  *Cimoli*, 2022 WL 580789, at *6.[46]  Here then,

19  the state of the wrong is the consumer's state of residence, each state of which has a very strong

20  interest in regulating conduct and liability within its borders and applying its own laws to its own

21  residents' purchases.  *Mazza*, 666 F.3d at 594.  This established rule directly undercuts Plaintiffs'

22  (incorrect) argument that Apple's principal place of business being in California dictates the

23  application of California law.  *Compare* Mot. at 21, *with*, *e.g.*, *Lewallen*, 2002 WL 31300899, at

24  *5 ("Plaintiffs presume that California law will apply to all members' claims merely because the

25  defendants are located in California [...] That presumption is erroneous.").  By contrast,

26  California's interest in applying its own law to out-of-state transactions is "attenuated"—

27

---

28  [45] *See also* Restatement (Second) of Conflict of Laws § 148 (key to conflicts-of-law analysis is
   the location where plaintiff receives representation and acts in reliance).
   [46] *See also Shuman v. SquareTrade Inc.*, 2020 WL 7458001, at *6 (N.D. Cal. Dec. 18, 2020).

APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

1   particularly here, where the "place of the wrong" is each class member's home state.  *See Mazza*,

2   666 F.3d at 593-94 (citing *Hernandez v. Burger*, 102 Cal. App. 3d 795, 802 (1980)).[47]

3       **E.       No Class Can Be Certified Under Rule 23(c)(4)**

4       Plaintiffs' request to certify a class under Rule 26(c)(4), "solely [as to] the question[ ] of

5   whether Apple made material misrepresentations regarding storage capacity to the Class" (Mot. at

6   32, 35:12-13) fails as well.  Issue certification still "requires that common questions predominate

7   over individual questions with respect to [ ] the specific issue that is certified." *Stickles*, 2021 WL

8   6117702, at *7; *Reitman*, 830 F. App'x at 882 (affirming denial of putative Rule 23(c)(4) class

9   where "numerous individualized issues affecting determinations of liability make Rule 23(c)(4)

10  certification inefficient").  As discussed in Sections IV.A and IV.B, whether Apple's alleged

11  misstatements were material necessarily turns on individualized evidence specific to each class

12  member—including, but not limited to, whether a given class member had seen any of Apple's

13  Upgrade Screens before their purchase/upgrade at issue; whether they read articles from Apple or

14  other sources alerting them about the size of iOS 8; whether they already knew that operating

15  systems occupy space from previously owning an iPhone, iPad, or other smartphone/tablet; and

16  whether they (like Endara) bought their device for reasons unrelated to storage capacity and/or

17  did not consider the "16GB" representation as part of the purchase process.  Plaintiffs have

18  provided no classwide evidence of materiality, and the evidence shows that Apple's "conduct"

19  was not material for many class members.

20  **V.     CONCLUSION**

21      For the foregoing reasons, the Court should deny Plaintiffs' Motion in full.

22  Dated: May 17, 2022                              O'MELVENY & MYERS LLP

23                                                   By:  */s/ Matthew D. Powers*

24                                                   *Counsel for Defendant*
                                                     APPLE INC.

25

---

26  [47] Plaintiffs made no argument for New York and Florida subclasses (the only state subclasses
    conceivably available, *see* Compl. ¶ 10), and have therefore waived the issue.  *Hartranft v.*

27  *Encore Capital Grp.*, 543 F. Supp. 3d 893, 913-14 (S.D. Cal. 2021) ("Plaintiff failed to advance
    any argument against the application of South Dakota law, and as such, waived any argument to

28  the contrary.").  Waiver aside, NY and FL subclasses would suffer from the same deficiencies—
    namely, individualized inquiries will predominate.  *See* Section IV.B.

35                          APPLE'S OPP. TO MOT. FOR CLASS CERT.
                            NO. 5:14-CV-05659-EJD