UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PAUL ORSHAN, et al., | Case No.  5:14-cv-05659-EJD |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE EXPERT TESTIMONY AND TO CERTIFY CLASS** |
| v. | |
| APPLE INC., | |
| Defendant. | Re: ECF Nos. 194, 213, 226 |

Before the Court is Plaintiffs' second motion for class certification of claims that Defendant Apple Inc. misled consumers about the available storage capacity of certain smartphone and tablet devices running its iOS 8 operating system.  The Court denied Plaintiffs' initial class certification motion on adequacy, typicality, and predominance grounds.  Now, with new class representatives and newly developed evidence, Plaintiffs again move for class certification.  Apple opposes class certification and, relatedly, moves to exclude parts of the report by Plaintiffs' expert, Dr. Andreas Groehn.  After the parties fully briefed both motions, the Court held a hearing on these matters.  Following careful consideration of the parties' submissions[1] and their arguments at hearing, the Court GRANTS IN PART and DENIES IN PART Apple's motion to exclude and GRANTS IN PART and DENIES IN PART Plaintiffs' motion for class certification.

---

[1] After the hearing, Plaintiffs moved for leave to file supplemental authority, which Apple opposed to the extent Plaintiffs made arguments about that authority.  The Court GRANTS Plaintiff's motion for leave to file supplemental authority.  The Court considers Plaintiffs' new authority but does not consider either side's arguments about that authority.

Separately, both sides requested judicial notice of certain facts and publications.  ECF Nos. 203, 208.  Neither side opposes judicial notice, and the Court finds both sides' requests proper under Federal Rule of Evidence 201.  Therefore, the Court GRANTS both requests for judicial notice.

Case No.: 5:14-cv-05659-EJD
ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

United States District Court
Northern District of California

## I.      BACKGROUND

Plaintiffs are Paul Orshan, Deanna Ness, Kye Weasner, and Margaret Hart, each of whom purchased Apple devices advertised as having 16 gigabytes of storage.  Decl. of Deanna Ness ("Ness Decl.") ¶ 2, ECF No. 194-29; Decl. of Kye Weasner ("Weasner Decl.") ¶ 2, ECF No. 194-30; Decl. of Margaret Hart ("Hart Decl.") ¶ 2, ECF No. 194-31; Decl. of Paul Orshan ("Orshan Decl.") ¶ 2, ECF No. 194-37.  Three of the Plaintiffs—Ms. Ness, Mr. Weasner, and Ms. Hart—purchased their 16 GB Apple devices with iOS 8 preinstalled.  Ness Decl. ¶ 3; Weasner Decl. ¶ 3; Hart Decl. ¶ 3.  Mr. Orshan's device did not initially come with iOS 8, but he later upgraded to iOS 8.  Orshan Decl. ¶ 3.  All four Plaintiffs testified to believing, based on Apple's representations, that they would receive 16 gigabytes of storage for personal use; Plaintiffs claim that they would not have purchased their devices had they known iOS 8 took up a significant portion of the advertised 16 gigabytes of storage.  Ness Decl. ¶¶ 4–5; Weasner Decl. ¶¶ 4–5; Hart Decl. ¶¶ 4–5; Orshan Decl. ¶¶ 4–5.  Because Plaintiffs believe that Apple misrepresented the amount of storage capacity available in their 16 GB devices, they sued Apple under three California consumer protection laws:  the Unfair Competition Law ("UCL"), the False Advertising Law ("FAL"), and the Consumer Legal Remedies Act ("CLRA").

Plaintiffs now seek to certify three classes.  First, they propose a nationwide "Upgrade Subclass" consisting of those who purchased 16 GB Apple devices without iOS 8 between March 11, 2011 and September 16, 2014, and who subsequently upgraded those devices to iOS 8 between September 17, 2014 and September 30, 2016.  Renewed Mot. for Class Cert. ("Class Mot.") 11, ECF No. 194.  Second, they propose a nationwide "Preinstall Subclass" consisting of those who purchased 16 GB Apple devices with iOS 8 preinstalled between September 17, 2014 and September 30, 2016.  *Id.*  Finally, as an alternative to the nationwide Preinstall Subclass, Plaintiffs propose a "California Preinstall Subclass" consisting of Preinstall Subclass members who purchased their 16 GB Apple devices in California.  *Id.*

## II.      MOTION TO EXCLUDE

The Court begins with Apple's motion to exclude certain parts of Dr. Groehn's expert

United States District Court
Northern District of California

1    report.  Mot. to Exclude Testimony of Dr. Andreas Groehn ("Expert Mot."), ECF No. 213.

2    Specifically, Apple takes issue with Dr. Groehn's opinions about classwide damages and seeks to

3    exclude all three of Dr. Groehn's proposed damage models.

4          In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Federal

5    Rule of Evidence 702 requires courts to serve as gatekeepers of expert testimony to ensure that

6    such testimony "rests on a reliable foundation and is relevant to the task at hand."  509 U.S. 579,

7    597 (1993).  At the class certification stage, this requirement is somewhat relaxed, and courts do

8    not always need to conduct a full *Daubert* analysis.  *Lytle v. Nutramax Lab'ys, Inc.*, --- F.4th ----,

9    No. 22-55744, 2024 WL 3915361, at *11 (9th Cir. Aug. 23, 2024).  The level of scrutiny that

10   applies at class certification "is a function of what aspect of [Federal Rule of Civil Procedure] 23

11   is being addressed."  *Id.*  Where an expert offers opinions to show that damages can be measured

12   on a classwide basis but has "has not [yet] collected all of the necessary data to perform his

13   calculations," courts perform only a limited *Daubert* analysis focused on the expert's

14   methodology, leaving a "full-blown *Daubert* assessment" of the expert's results for another time.

15   *Id.*

16         That is the case here.  In opining about how he could measure classwide damages, Dr.

17   Groehn had access to a dataset of subsidized prices for relevant Apple devices at the time those

18   devices initially entered the market, Am. Expert Rep. of Dr. Andreas Groehn ("Am. Groehn

19   Rep.") tbl.4, ECF No. 194-1, but he did not have access to datasets showing how prices changed

20   as newer generation devices were released, or showing how many units of each device were sold.

21   *Id.* ¶¶ 92, 106.  Since those missing datasets would help Dr. Groehn further refine his damage

22   models, *id.*, it is too early to conduct a full *Daubert* analysis.

23         Under the limited *Daubert* rubric appropriate for class certification, the Court considers

24   two factors: (1) relevance to class certification, and (2) reliability of the expert's proposed

25   methodology "in light of the criteria for class certification and the current state of the evidence."

26   *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012) (citation omitted); *see*

27   *also Lytle*, 2024 WL 3915361, at *11.  These two factors track those required by *Daubert* and

28   Case No.: 5:14-cv-05659-EJD

ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

Rule 702.  *Daubert*, 509 U.S. at 597 (requiring judges to "ensur[e] that an expert's testimony both rests on a *reliable foundation* and is *relevant to the task at hand*") (emphasis added); Fed. R. Evid. 702.  But unlike in a full *Daubert* analysis, the question of relevance is tailored to class certification, and the required showing of reliability less demanding.  Applying this limited *Daubert* rubric, the Court agrees with Apple that Dr. Groehn's first damage model (the "Rule-of-Three" Model) does not pass muster.  But the Court finds that Dr. Groehn's remaining two damage models (the "Incremental Price Regression Model" and the "Hedonic Regression Model") are reliable enough to consider at the class certification stage.

### A.    Rule-of-Three Model

The Rule-of-Three Model relies on a simple calculation to determine the value of storage: divide the price difference between two device models (*e.g.*, the price difference between a 16 GB iPad 2 and 32 GB iPad 2) by the storage capacity difference between those same two devices models.  Am. Groehn Rep. ¶ 83.  This is the exact model that the Court already rejected in denying Plaintiffs' previous class certification motion.  *Id.* ¶ 78.

The Court previously rejected the Rule-of-Three model because the model had two obvious flaws.  First, the model assumed that each additional gigabyte of storage was worth the same amount as the previous gigabyte of storage even though market data showed that assumption to be plainly wrong.  Order Den. Mot. for Class Cert. ("Prior Order") 4–5, ECF No. 184.  For example, consumers paid $100 more for 16 additional gigabytes of storage when moving from the 16 GB version of the iPad 2 to the 32 GB version.  *Id.*  But consumers still only paid $100 more for 32 additional gigabytes when moving from the 32 GB version to the 64 GB version.  *Id.*  Second, the model produced unexplained discrepancies, such as estimating that each gigabyte of storage in the iPad mini 3 without cellular connection was worth $2.08 but estimating that each gigabyte in iPad mini 3 with cellular connection was worth three times as much at $6.25.  *Id.* at 5.

In offering the Rule-of-Three Model a second time, Plaintiffs have addressed only one of those two flaws.  Plaintiffs corrected the second flaw, explaining that the discrepancy in iPad mini 3 prices was the result of a data entry error that Dr. Groehn has since corrected.  Class Mot. 31

1  n.13.  The first flaw remains.  Dr. Groehn still has not justified the assumption that each additional

2  gigabyte of storage is worth the same amount as the previous gigabyte.  In fact, Dr. Groehn admits

3  that this assumption is wrong.  Dr. Groehn concedes that less consumer demand for additional

4  storage as storage capacity increases, coupled with the economic concept of diminishing marginal

5  utility, causes each additional gigabyte of storage to be worth *less* than the previous gigabyte.

6  Am. Groehn Rep. ¶ 86.

7          Dr. Groehn tries to rationalize his use of this faulty assumption because using the

8  assumption supposedly underestimates true damages.  *Id.* ¶¶ 88–89.  Dr. Groehn explains that the

9  Rule-of-Three Model uses later gigabytes of storage (*i.e.*, the 16th through 32nd gigabytes) to

10  estimate the value of earlier gigabytes of storage (*i.e.*, the 14th through 16th gigabytes, which are

11  approximately the gigabytes that consumers allegedly did not have access to).  *Id.* ¶¶ 87–89.

12  According to him, since the later gigabytes are worth less than the 14th through 16th gigabytes,

13  the model's estimated value for the 14th through 16th gigabytes is necessarily lower than the

14  actual value.  *Id.*  But *Daubert* asks whether expert opinions are reliable and relevant, not whether

15  they are conservative.  *See* Fed. R. Evid. 702 (no discussion of conservatism as a criterion for

16  admissible expert opinions).  If a damage model could survive *Daubert* by simply underestimating

17  true damages, an expert could avoid having a court exclude her opinions by picking an arbitrary

18  damage figure that is comfortably below any reasonable amount of true damages even though such

19  an opinion would be plainly unreliable.  Thus, Plaintiffs cannot sneak Dr. Groehn's Rule-of-Three

20  Model past *Daubert* on the ground that the model consistently underestimates true damages.

21          The Rule-of-Three Model makes an assumption that even Dr. Groehn admits is wrong.

22  Therefore, it does not reliably estimate damages, and the Court GRANTS Apple's motion to

23  exclude as to that model.

24          **B.      Incremental Price Regression and Hedonic Regression Models**

25          Dr. Groehn's remaining two damage models are both based on regressions.  Because

26  Apple's criticisms of each are similar, the Court addresses both models together.  While Apple

27  makes potentially compelling arguments about the persuasiveness of Dr. Groehn's two regression

28  Case No.: 5:14-cv-05659-EJD

United States District Court
Northern District of California

1  models, the Court's role under *Daubert* is that of a gatekeeper tasked with ensuring a threshold

2  level of reliability and relevance, not that of a factfinder charged with deciding how convincing an

3  expert's opinion is. *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted). From

4  that angle, Apple's arguments go to the weight of Dr. Groehn's opinions, not their admissibility,

5  and the Court finds that Dr. Groehn's two regression models survive *Daubert* at this stage.

6  **1.     Reliability**

7       Apple's main argument for excluding Dr. Groehn's regression models is that those models

8  are unreliable. However, Apple's reliability arguments are based on challenges to Dr. Groehn's

9  results rather than challenges to Dr. Groehn's methodology. The Court found above that

10  conducting a full *Daubert* analysis of Dr. Groehn's results is not appropriate right now because

11  there is additional data that Dr. Groehn needs to finalize his proposed damage models. Apple's

12  reliability arguments therefore do not justify excluding Dr. Groehn's regression models at class

13  certification. And even if the Court were to consider Apple's results-based critiques, those

14  critiques still would not justify excluding Dr. Groehn's regression models.

15  **a.     Inconsistent Results**

16       Apple's primary argument is that Dr. Groehn's regression models are unreliable because

17  they produce inconsistent results both internally within the same model and externally when

18  comparing between the two models. Expert Mot. 8.

19       Apple's first contention about internal inconsistency appears to draw on one of the Court's

20  concerns in its Prior Order. There, the Court excluded Dr. Groehn's Rule-of-Three Model partly

21  because that model produced internally inconsistent results. The Rule-of-Three Model produced

22  vastly different damage estimates for Apple devices where storage ostensibly should have been

23  valued similarly; namely, it estimated that storage for the iPad mini 3 with cellular connection was

24  worth $6.25 per gigabyte while storage for the iPad mini 3 and without cellular connection was

25  worth $2.08 per gigabyte. Prior Order 5. That is not the case for Dr. Groehn's two regression

26  models. Both the Incremental Price Regression and the Hedonic Price Regression Models

27  produce roughly the same damage estimates for iPad versions with and without cellular

Case No.: 5:14-cv-05659-EJD
ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

United States District Court
Northern District of California

1   connections.  Am. Groehn Rep. tbl.9.  And while there are some differences in the damage

2   estimates between different generations of iPhones and iPads, Apple has not argued or otherwise

3   suggested that damages should be the same across different device generations.

4       Nonetheless, Apple claims that separate analysis from its own expert, Dr. Justin McCrary,

5   shows that Dr. Groehn's regression models are internally inconsistent.  Expert Mot. 8–9.[2]  At a

6   high level, Dr. Groehn's regression models estimate damages by comparing 16 GB Apple devices

7   to their counterparts with greater storage capacities (*e.g.*, comparing the 16 GB iPhone 6 with 64

8   GB and 128 GB versions of the iPhone 6).  Expert Rep. of Prof. Justin McCrary ("McCrary Rep.")

9   ¶ 24, ECF No. 201-18.  As Dr. McCrary observes, the results from Dr. Groehn's regression

10  models can vary depending on the comparator devices chosen.  For example, when Dr. Groehn

11  used prices from the 16 GB, 32 GB, 64 GB, and 128 GB versions of the iPad Air to run his

12  Incremental Price Regression Model, he estimated that the 16th gigabyte of storage was worth

13  $7.36.  Am. Groehn Rep. fig.25.  But the Incremental Price Regression Model produces different

14  results when using different comparator devices.  Excluding the 32 GB version of the iPad Air

15  from the regression leads to an estimated price of $5.28 for the 16th gigabyte of storage.  McCrary

16  Rep., Ex. 1.  And excluding both the 32 GB and 64 GB versions generates an estimated price of

17  $2.68 for the 16th gigabyte.  *Id.*  Dr. McCrary demonstrated similar outcomes when using

18  different comparators with the Hedonic Regression Model.  *Id.*

19      These observations about the choice of comparators are not fatal to Dr. Groehn's

20  regression models.  When the Court rejected the Rule-of-Three Model for producing internally

21  inconsistent results, it did so because the model produced notably different results for two iPad

22  models that should have had similar results.  By contrast, the inconsistencies in the two regression

23  models here arise only when different data (*i.e.*, different comparator devices) are inputted into

24  those models.  Apple has not offered any reason for the Court to expect different data to produce

25

26  ─────────────
    [2] Apple purports to cite Dr. Groehn's report for these inconsistent results, but a review of Dr.
27  Groehn's report shows that many of the allegedly inconsistent numbers do not come from his
    report.  Instead, those numbers come from Dr. McCrary's report.

28  Case No.: 5:14-cv-05659-EJD
    ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
                    7

United States District Court
Northern District of California

1    similar results, especially when, as illustrated by the iPad Air example above, there are so few

2    datapoints to begin with.[3]

3            To the extent Apple's criticism raises any doubts about Dr. Groehn's regression models,

4    those are doubts related to Dr. Groehn's choice of data.  These data choices are easy to

5    understand—whether to include a particular Apple device in the regression model or not—so a

6    jury could readily evaluate whether those choices add to or detract from Dr. Groehn's

7    persuasiveness.  As such, Apple's arguments about comparator devices go to weight, not

8    admissibility, and they are better directed to the jury as factfinder, not to the Court as gatekeeper.

9    *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) (when a

10   jury is able to assess purported deficiencies in an expert's methodology, it is appropriate for juries

11   to do so rather than the Court).

12           Apple's arguments about the inconsistencies between the Incremental Price Regression and

13   Hedonic Regression Models similarly do not justify excluding those two models.  Apple contends

14   that, because the Incremental Price Regression and Hedonic Regression Models are both supposed

15   to measure the same quantity, the fact that the two models yield disparate results when run on the

16   same data shows that neither model is reliable.  Expert Mot. 9–10.  Again, while Apple might be

17   able to convince a jury with that argument, Apple has not shown that Dr. Groehn's models are so

18   fatally flawed as to require exclusion.

19           Usually, when two models produce different results, the question of which model is more

20   accurate falls to the factfinder as part of a classic battle of the experts.  After hearing each expert's

21   thoughts about why one model is better than the other, the factfinder then weighs the experts'

22   testimony and decides which model she trusts more.  Of course, there is no battle of the experts

23

24   [3] That is not to say that one should never expect reliable models to produce similar results with
     different data.  For example, because Dr. Groehn's Rule-of-Three Model assumed that each
25   gigabyte of storage had the same value, that model should be expected to yield the same result
     regardless of the comparator device chosen.  The fact that the Rule-of-Three Model did not do so
26   rendered the model unreliable, not because of some general rule requiring different data to
     produce the same result, but because the different results falsified one of the model's key
27   assumptions.

28   Case No.: 5:14-cv-05659-EJD
     ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
                                     8

United States District Court
Northern District of California

1   here. Instead of two competing experts offering competing models, a single expert, Dr. Groehn,

2   proposes both models at issue. And instead of there being testimony about how one model is

3   better than the other, Dr. Groehn has refused to pick favorites. Dep. of Andreas Groehn 252:10–

4   24, ECF No. 201-19. As Apple notes, this is somewhat unusual. But it is not grounds for

5   exclusion. Like in a classic battle of the experts, it is the factfinder's job, not the Court's, to

6   decide which of the two models to put more trust in. One model might be better than the other,

7   but that does not mean either (or both) models are unreliable. Indeed, it is natural for there to be

8   "some minor disagreement between [] models." *In re LIBOR-Based Fin. Instruments Antitrust*

9   *Litig.*, 299 F. Supp. 3d 430, 478 (S.D.N.Y. 2018).

10      Of course, some deviations between two different models can be so significant that they

11   call an expert's opinion into doubt even at the *Daubert* stage. For example, courts might exclude

12   an expert's opinion where the expert proposes two different models that "produce directionally

13   inconsistent results a substantial portion of the time." *Id.* at 477. Or, courts might find experts to

14   be unreliable where they offer different models to measure the same quantity and those models

15   produce results magnitudes apart from each other. *Cf. Immunex Corp. v. Sanofi*, No. 17-cv-02613,

16   2018 WL 6252460, at *10 (C.D. Cal. Aug. 24, 2018) (in the context of evaluating prior art for

17   claim construction, "if two experimental designs were to produce such diametrically opposed

18   results as 0% inhibition and 100% inhibition between the same antibody pair in the same

19   direction, that would be a sure sign that the methodology in at least one of those assays was

20   flawed"). The Incremental Price Regression and Hedonic Regression Models, however, do not

21   produce results diverging to that extent. *See* Am. Groehn Rep. tbl.9.

22      Therefore, the supposed discrepancies in and between Dr. Groehn's regression models do

23   not require exclusion.

24                    **b.    Differences From Real-World Pricing**

25      Apple's secondary argument is that Dr. Groehn's regression models are unreliable because

26   they produce results that are unrealistic when compared to real-world pricing. Once again, that

27   argument goes to weight, not admissibility.

28   Case No.: 5:14-cv-05659-EJD
     ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
                                     9

United States District Court
Northern District of California

1    First, Apple claims that Dr. Groehn's models estimate storage to represent a

2  disproportionately high amount of the total value of Apple's devices—77% or higher for some

3  devices. McCrary Rep. ¶ 44. But in calculating those numbers, Dr. McCrary used the *subsidized*

4  prices of Apple devices as a proxy for total value. *Id.*; Am. Groehn Rep. ¶ 74 & tbl.4 (noting the

5  use of subsidized prices). As the term suggests, subsidized prices account for compensation that

6  Apple received beyond the price paid by the consumer, meaning that subsidized prices do not

7  accurately represent total value. The *unsubsidized* prices are a better reflection of Apple devices'

8  total value, and such prices can be significantly greater than subsidized ones. Am. Groehn Rep.

9  ¶ 74 (a 16 GB iPhone 6 is priced at $199 when subsidized and $649 when unsubsidized). Thus,

10  Apple's arguments about storage as a percentage of an Apple device's total value miss the mark.

11    Second, Apple asserts that it prices its devices in increments of $100 between different

12  tiers of storage, and that all its prices end in the digit "9." McCrary Rep. ¶¶ 47, 53–55. From

13  Apple's perspective, any damage model that does not adhere to these historical practices is

14  unreliable because it produces unrealistic results. For instance, the Incremental Price Regression

15  Model estimates $6.82 in damages for the iPhone 6. *Id.* ¶ 47. The actual (subsidized) market

16  price of a 16 GB iPhone 6 was $199, so this result implies that, if Apple had made disclosures

17  about the amount of storage available to users, the but-for price of the iPhone 6 would have been

18  $192.18. *Id.* (subtracting $6.82 from $199). Since, according to Apple, it would never actually set

19  such a price, Dr. Groehn's model must be unreliable. Expert Mot. 14.

20    Apple misunderstands the relevant measure of damages. Damages do not depend on the

21  but-for price that *Apple* would be willing to set in a hypothetical world with accurate disclosures.

22  Instead, damages are based on "the price *a consumer* would have been willing to pay for the

23  product had it been labeled accurately." *Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 553

24  (N.D. Cal. 2021) (emphasis added) (citing *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d

25  979, 988–89 (9th Cir. 2015)). Specifically, damages are "the difference between what was paid

26  and what a *reasonable consumer* would have paid at the time of purchase without the fraudulent

27  or omitted information." *Pulaski*, 802 F.3d at 989 (emphasis added) (citing *Kwikset Corp. v.*

United States District Court
Northern District of California

1   *Superior Ct.*, 51 Cal. 4th 310, 329 (2011)).[4]

2       Accordingly, the fact that Dr. Groehn's regression models do not align perfectly with

3   Apple's real-world pricing practices does not render his models unreliable.

4           **2.      Relevance**

5       In addition to Apple's arguments about Dr. Groehn's reliability, Apple also claims that Dr.

6   Groehn's regression models are not relevant because they do not translate Plaintiffs' damages

7   theory into economic terms as is required at the class certification stage. *Comcast Corp. v.*

8   *Behrend*, 569 U.S. 27, 38 (2013). In particular, Apple asserts that Dr. Groehn (1) wrongly applied

9   the "fraud on the market" theory to damages, (2) wrongly assumed that consumers were harmed

10  even if they purchased Apple devices before iOS 8 was released, and (3) failed to account for

11  individual consumers' disparate expectations about storage space on their Apple devices. Expert

12  Mot. 15–23.

13      The first two arguments are challenges to the merits of Plaintiffs' damages theory—they

14  do not call into question whether Dr. Groehn's regression models adequately translate Plaintiffs'

15  theory into economic analysis. Such merits issues "are not grounds for exclusion of expert

16  testimony," *Cabrera v. Google LLC*, No. 5:11-cv-01263, 2023 WL 5279463, at *15 (N.D. Cal.

17  Aug. 15, 2023), and it is "wholly inappropriate" to raise merits arguments in *Daubert* briefing.

---

19  [4] Applying this "reasonable consumer" measure of damages instead of Apple's proposed measure
20  of damages also makes good sense. For one, the more market power a defendant company has,
    the more easily it can argue that it would not have changed its prices even with additional
21  disclosures correcting the alleged misrepresentations. In that case, Apple's proposed measure of
    damages—based on the price that a company would set rather than the price a reasonable
22  consumer would pay—would effectively shield companies with greater market power from
    damages.

23  In fact, Apple's argument would probably shield a *majority* of companies from damages, even
    those without much market power. Most companies choose prices ending in "9," McCrary Rep.
24  ¶ 47 & n.93, so if the Court were to accept the premise that damage models need to replicate real-
    world prices, that would be akin to requiring most damage models to generate but-for prices that
25  end in "9." For that to happen, damage models would need to value the product features that a
    defendant allegedly made misrepresentations about in perfect $10 or $100 increments. There is
26  little reason to believe that, among the vast array of product features that a plaintiff could allege
    misrepresentations about, any significant number of those product features would have values at
27  those perfect increments. As a consequence, Apple's argument would immunize most companies
    from damages in practice.

28  Case No.: 5:14-cv-05659-EJD
    ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

United States District Court
Northern District of California

1    *Brown v. Google, LLC*, No. 20-cv-3664, 2022 WL 17961497, at *4 n.4 (N.D. Cal. Dec. 12, 2022).

2    Meanwhile, Apple's third argument misunderstands Plaintiffs' damages theory.  Plaintiffs' price

3    premium theory measures damages based on "what a *reasonable consumer* would have paid at the

4    time of purchase."  *Pulaski*, 802 F.3d at 989 (emphasis added) (citation omitted).  The reasonable

5    consumer standard is objective.  *Lytle*, 2024 WL 3915361, at *14; *Cabrera*, 2023 WL 5279463, at

6    *29; *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 407 (N.D. Cal. 2021); *see also Montera v. Premier*

7    *Nutrition Corp.*, 111 F.4th 1018, 1033 (9th Cir. 2024) (same in the context of New York law).  So,

8    Plaintiffs' theory did not require Dr. Groehn to take individual consumer expectations into

9    account.

10       As such, Dr. Groehn's regression models are not subject to exclusion on the basis of

11   relevance.

12                          *       *       *

13       In sum, the Court excludes Dr. Groehn's Rule-of-Three Model as unreliable but finds that

14   the Incremental Price Regression and Hedonic Regression Models survive *Daubert* at the class

15   certification stage.  Thus, the Court GRANTS IN PART and DENIES IN PART Apple's motion

16   to exclude.

17       To be clear, the Court expresses no opinion on whether Dr. Groehn may present both

18   regression models to a jury.  Even if both regression models eventually survive a full *Daubert*

19   assessment, presenting both models to a jury might cause confusion in violation of Federal Rule of

20   Evidence 403.  *See Daubert*, 509 U.S. at 595.  That is especially so if the jury would not hear

21   testimony from Dr. Groehn explaining how the two regression models differ, or explaining why

22   the jury might prefer one over the other.  Ultimately, Plaintiffs may need to choose one regression

23   model over the other, but that time is not now.

24   **III.    MOTION FOR CLASS CERTIFICATION**

25       Having resolved Apple's motion to exclude, the Court turns to class certification.  Federal

26   Rule of Civil Procedure 23 governs class certification.  Under Rule 23, all classes must satisfy

27   four requirements: numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).

28   Case No.: 5:14-cv-05659-EJD
     ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

1   Then, at least one of the three circumstances under Rule 23(b) must apply. *Olean Wholesale*

2   *Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). Here,

3   Plaintiffs invoke Rule 23(b)(3), which adds two more requirements: predominance and

4   superiority. In assessing these six class certification requirements, the Court must conduct a

5   rigorous analysis, *Olean*, 31 F.4th at 664, and consider the merits of Plaintiffs' claims to the extent

6   they are relevant to Rule 23's requirements. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568

7   U.S. 455, 466 (2013).

8       Previously, the Court found that Plaintiffs had established the numerosity, commonality,

9   and superiority elements. Prior Order 11, 23. Apple does not argue that the record has developed

10  in a way that requires reconsideration of those findings. *See* Opp'n to Class Mot. ("Class Opp'n"),

11  ECF No. 201. So, the Court finds that Plaintiffs have met the numerosity, commonality, and

12  superiority requirements for the same reasons as before and focuses in this Order on typicality,

13  adequacy, and predominance.

14      **A.    Typicality and Adequacy**

15      The typicality and adequacy requirements test whether the proposed class representatives

16  and class counsel can satisfactorily represent absent class members. Typicality asks whether the

17  class representatives' claims and defenses are similar to those of absent class members. *Hanon v.*

18  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). This is a permissive

19  inquiry. A representative's claims and defenses need not be "substantially identical" to those of

20  absent class members; it is enough that the representative's and absent class members' claims and

21  defenses "are reasonably co-extensive." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 729 (9th Cir.

22  2020) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). In turn, adequacy

23  asks whether class representatives and class counsel can be expected to zealously prosecute claims

24  on behalf of the class and to protect the class's interests. *Ellis v. Costco Wholesale Corp.*, 657

25  F.3d 970, 985 (9th Cir. 2011). In determining adequacy, courts ask, "(1) do the named plaintiffs

26  and their counsel have any conflicts of interest with other class members and (2) will the named

27  plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (quoting

28  Case No.: 5:14-cv-05659-EJD

United States District Court
Northern District of California

1    *Hanlon*, 150 F.3d at 1020).

2              **1.     Paul Orshan**

3              Plaintiffs propose Paul Orshan as the sole class representative for the Upgrade Subclass.

4    Although the Court previously rejected Apple's typicality and adequacy challenges to Mr. Orshan,

5    Prior Order 12–14, Apple again challenges Mr. Orshan on those grounds.  According to Apple,

6    Mr. Orshan is subject to two unique defenses: (1) that he was not exposed to any representations

7    made by Apple about storage capacity and (2) that he did not rely on any such representations.

8    Class Opp'n 31–32.  The existence of such unique defenses may defeat typicality.  *DZ Rsrv. v.*

9    *Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024).  But Rule 23 does not require complete

10   identity of claims and defenses between class representatives and absent class members.  *Castillo*,

11   980 F.3d at 729.  The presence of unique defenses only poses an obstacle to class certification

12   when those defenses "threaten to become the focus of the litigation."  *Hanon*, 976 F.2d at 508.

13   Apple's unique defenses against Mr. Orshan are not so substantial that they risk becoming the

14   focus of this case.

15             Apple's first defense—lack of exposure to Apple's representations—is not supported by

16   Mr. Orshan's testimony.  Apple points to testimony that Mr. Orshan did not speak to an Apple

17   representative or employee before purchasing his 16 GB device.  Class Opp'n 31; Dep. of Paul

18   Orshan ("Orshan Dep.") 85:23–25, ECF No. 201-3.  But Mr. Orshan also testified that he

19   researched his options on Apple's website and that he specifically asked to purchase a 16 GB

20   device.  Orshan Dep. 85:6–15, 86:4–14.  By specifically asking for a 16 GB device, Mr. Orshan

21   showed that he was necessarily aware that Apple labeled its devices by storage capacity, which in

22   turn showed that he was exposed to at least some of Apple's representations about storage

23   capacity.  *See also infra* Section III.B.2.  Apple's point about Mr. Orshan's failure to speak with

24   an Apple representative only demonstrates that Mr. Orshan was not exposed to every possible

25   representation about storage capacity.  But a class representative need not have been exposed to

26   every single relevant misrepresentation.  Even if the exact representations that were received

27   might differ between a class representative and absent class members, the question for typicality is

28   Case No.: 5:14-cv-05659-EJD

1  whether the nature of the representations received by the representative and class members is the

2  same.  *See Ellis*, 657 F.3d at 984 ("Typicality refers to the nature of the claim or defense of the

3  class representative, and not to the specific facts from which it arose or the relief sought.")

4  (quoting *Hanon*, 976 F.2d at 508); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175

5  (9th Cir. 2010) ("Typicality can be satisfied despite different factual circumstances . . . .").  Like

6  all absent class members, Mr. Orshan claims to have been injured by Apple's representations that

7  its iPhones and iPads came with 16 gigabytes of storage.  That is enough for typicality.

8          Similarly, Apple's argument that reliance issues create a unique defense does not render

9  Mr. Orshan atypical.  To establish reliance under the UCL, FAL, and CLRA, Mr. Orshan must

10 show that Apple's misrepresentations about storage space were *a* cause of his decision to purchase

11 a 16 GB Apple device, but he does not need to show that they were the "*sole or even the decisive*"

12 cause of his decision.  *Kwikset*, 51 Cal. 4th at 327 (UCL and FAL) (emphasis added) (quoting *In*

13 *re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009)); *see also Lytle*, 2024 WL 3915361, at *15

14 (same for CLRA).  Mr. Orshan testified that the alleged misrepresentations were one cause of his

15 decision to purchase a 16 GB device, explaining that he decided on the 16 GB device because he

16 "believed that the stated gigabytes of storage for me was going to be sufficient."  Orshan Dep.

17 86:12–14.

18          Apart from the two supposed unique defenses above, Apple also invokes the Court's prior

19 finding that members of the Upgrade Subclass who upgraded wirelessly saw different

20 representations about the size of iOS 8 than those who upgraded via iTunes.  Class Opp'n 32

21 (quoting Prior Order 20).  Apple claims that, due to this difference, Mr. Orshan can only represent

22 wireless upgraders because he upgraded wirelessly.  *Id.*  The problem is that Plaintiffs have

23 reoriented their theory of liability since the Court originally denied class certification.  Now,

24 Plaintiffs assert that Apple is liable for misleading Upgrade Subclass members about available

25 storage capacity at the time of purchase rather than at the time of upgrading.[5]  The alleged

26

27 [5] The Court expresses no opinion on whether it was appropriate for Plaintiffs to shift their theory, or whether Plaintiffs' new focus on misrepresentations at the time of purchase can survive scrutiny

28

United States District Court
Northern District of California

1   misrepresentations that Mr. Orshan, wireless upgraders, and iTunes upgraders received at the time

2   of purchase are all fundamentally the same—that Apple's devices had 16 gigabytes of storage.

3          Accordingly, the Court finds Mr. Orshan to be a typical and adequate representative for the

4   Upgrade Subclass.

5                        **2.        Deanna Ness and Margaret Hart**

6          Plaintiffs propose Deanna Ness and Margaret Hart as class representatives for the

7   nationwide Preinstall Subclass.  Like with Mr. Orshan, Apple argues that Ms. Ness and Ms. Hart

8   are atypical because they are subject to unique defenses regarding reliance.  Class Opp'n 32–33.

9   Also like with Mr. Orshan, those reliance arguments are not enough to disqualify either Ms. Ness

10  or Ms. Hart.

11         While neither Ms. Ness nor Ms. Hart recalled the exact representations about storage space

12  that they received from Apple, both remembered learning from Apple that their devices were

13  supposed to have 16 gigabytes of storage.  Dep. of Deanna Ness ("Ness Dep.") 159:2–6, 165:2–

14  166:9, ECF No. 201-5; Dep. of Margaret Hart ("Hart Dep.") 43:11–14, 118:6–119:15, ECF No.

15  201-6.  Plaintiffs are "not required to . . . prove individualized reliance on specific

16  misrepresentations or false statements where, as here, those misrepresentations and false

17  statements were part of an extensive [marketing] campaign."  *In re Tobacco II*, 46 Cal. 4th at 328;

18  *see also* Dep. of Raja Bose 57:11–58:11, ECF No. 194-3 (noting that Apple differentiates between

19  different version of the same iPhone or iPad model by storage capacity); *infra* Section III.B.2

20  (elaborating on the extensiveness of Apple's marketing).  Thus, being unable to remember specific

21  representations does not raise doubts about reliance.  In addition, both Ms. Ness and Ms. Hart

22  testified that they would have acted differently had they known that not all 16 gigabytes of storage

23  were available for personal use, showing that Apple's representations about storage were one

24  cause that contributed their decision to purchase 16 GB Apple devices.  Ness Dep. 63:8–17; Hart

25  Dep. 44:18–24, 48:3–49:14.  In the end, a jury may not believe Ms. Ness's and Ms. Hart's

26

27  on the merits.

28  Case No.: 5:14-cv-05659-EJD
    ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

United States District Court
Northern District of California

testimony about reliance, but their testimony is enough to assure the Court that they will not be preoccupied with reliance issues to the point of distraction.[6]

Apple also argues that Ms. Ness and Ms. Hart are inadequate because they have credibility issues.[7]  Class Opp'n 33–34.  However, credibility concerns only pose class certification obstacles in "rare circumstances" when there is "admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility."  *Mendez v. R+L Carriers, Inc.*, No. 11-cv-2478, 2012 WL 5868973, at *14 (N.D. Cal. Nov. 19, 2012) (quoting *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990)).  Such circumstances include when the named plaintiff is "a serial litigant who purchased stock solely to facilitate litigation" and when the named plaintiff "insist[s] that he was not really deceived by the alleged misrepresentation." *DZ Rsrv.*, 96 F.4th at 1239.  Simple inconsistencies in testimony are not enough.  *Cruz v. Dollar Tree Stores, Inc.*, Nos. 07-cv-2050, 07-cv-4012, 2009 WL 1458032, at *7 (N.D. Cal. May 26, 2009).  Yet, inconsistencies are all that Apple can point to here, and those inconsistencies can readily be explained by fading memories given the decade that has passed since the events relevant to this case.

As such, the Court finds that Ms. Ness and Ms. Hart are typical and adequate class representatives.

### 3. Kye Weasner

Plaintiffs propose Kye Weasner as a class representative for two subclasses—the nationwide Preinstall Subclass along with Ms. Ness and Ms. Hart, and the California Preinstall Subclass as the sole representative.  In challenging Mr. Weasner, Apple essentially repeats its arguments against the other proposed class representatives, claiming that reliance and credibility

[6] Apple also briefly argues that Ms. Ness was not injured because she never ran out of storage space.  Class Opp'n 33.  Even if true, the Court already rejected the premise that a consumer needed to run out of space to be harmed, Prior Order 21–22, so this argument does not render Ms. Ness atypical.

[7] Recent Ninth Circuit precedent places credibility issues under the rubric of typicality rather than adequacy, *DZ Rsrv.*, 96 F.4th at 1239, but the standards for judging whether credibility issues prevent plaintiffs from representing a class are the same regardless.

Case No.: 5:14-cv-05659-EJD
ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
17

1    issues prevent Mr. Weasner from filling a representative role.  For reasons similar to those

2    discussed above, the Court finds that reliance and credibility do not bar Mr. Weasner from acting

3    as a class representative.  Mr. Weasner testified that he received representations about his Apple

4    device's storage and that he would have acted differently if he had known that not all 16 gigabytes

5    of storage were available.  Dep. of Kye Weasner 64:5–7, 66:14–21, 71:9–17, ECF No. 194-10.

6    That is enough to assuage any concerns that he would be preoccupied with reliance issues.  And

7    Mr. Weasner's involvement in a single other class action, as well as minor inconsistencies in his

8    testimony, do not raise significant credibility concerns.  So, Mr. Weasner is typical and adequate.

9                      **4.    Class Counsel**

10        Plaintiffs propose a five-person team as class counsel.  They propose William Anderson of

11   Handley Farah & Anderson PLLC as lead counsel, to be supported by an executive committee

12   consisting of Robert Shelquist of Lockridge Grindal Nauen P.L.L.P., Michael McShane of Audet

13   & Partners, LLP, Charles LaDuca of Cuneo Gilbert & LaDuca, LLP, and Jon Herskowitz of Baron

14   & Herskowitz.  Class Mot. 16 n.7.  Apple does not contest Plaintiffs' pick of lead counsel, and

15   based on proposed counsel's resumes and litigation efforts to date, the Court finds that proposed

16   class counsel are adequate due to their "qualifications, experience, and commitment to the

17   prosecution of this case."  *Cottle v. Plaid Inc.*, 340 F.R.D. 356, 371 (N.D. Cal. 2021).  Although

18   the Court has doubts about whether a case of this size is most efficiently litigated with five

19   separate law firms, those doubts do not render class counsel inadequate.  Therefore, the Court

20   approves class counsel, but notes that, if and when class counsel move for attorneys' fees, the

21   Court will closely scrutinize counsel's billing records regarding allocation of labor to ensure that

22   this case is prosecuted efficiently and that class members are not paying for duplicative work.

23             **B.    Predominance**

24        To satisfy the predominance requirement, Plaintiffs must show that "the common,

25   aggregation-enabling, issues in the case are more prevalent or important than the non-common,

26   aggregation-defeating, individual issues."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453

27   (2016) (citation omitted).  This does not mean that common questions must outnumber individual

Case No.: 5:14-cv-05659-EJD

United States District Court
Northern District of California

1   questions.  In assessing predominance, courts give more important questions greater weight than

2   less important ones.  *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).

3   Thus, even if there is only a single common question, class certification may be proper if that

4   single common question is so significant that it predominates over all other individual questions.

5   *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc).

6       In this case, Apple argues that five important individual questions overwhelm common

7   issues: (1) choice of law, (2) cohesion, (3) materiality and reliance, (4) injury, and (5) damages.

### 1.       Choice of Law

9       The first step of a predominance analysis is to consider whether choice-of-law issues will

10   require a court to consider multiple states' laws.  *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059,

11   1067 (9th Cir. 2021).  This is because even if multiple states recognize similar claims, those

12   claims may have different elements or be subject to different defenses.  Such "variances in state

13   law [may] overwhelm common issues and preclude predominance for a single nationwide class."

14   *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012), *overruled on other grounds by*

15   *Olean*, 31 F.4th 651.  Because Plaintiffs here brought state claims, the Court applies the choice-of-

16   law rules from the forum state, California.  *Stromberg*, 14 F.4th at 1067.  Under California law,

17   there are two choice-of-law tests, and courts must decide which to apply based on the

18   circumstances.  *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 914 (2001).  When there is

19   a contractual choice-of-law clause, courts apply *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th

20   459 (1992), to determine if the claims at issue fall within the scope of that choice-of-law clause

21   and if such clause is enforceable.  *Wash. Mut. Bank*, 24 Cal. 4th at 914–15.  When there is no

22   controlling choice-of-law clause, courts instead use the governmental interest test.  *Id.*

### a.       Contract

24       Plaintiffs rely on the choice-of-law clause in the Software License Agreement ("SLA") for

25   iOS 8, so the Court begins with the *Nedlloyd* test.  The first step in the *Nedlloyd* test is to

26   determine whether the claims at issue fall within the scope of the relevant choice-of-law clause.

27   *Nedlloyd*, 3 Cal. 4th at 468.  The SLA's choice-of-law clause reads, "This License will be

28   Case No.: 5:14-cv-05659-EJD

United States District Court
Northern District of California

1    governed by and construed in accordance with the laws of the State of California, excluding its

2    conflict of law principles."  Decl. of Robert K. Shelquist, Ex. 13 ("SLA") § 12, ECF No. 194-14.

3    The use of broad language like "governed by" means that this choice-of-law clause "appl[ies] to

4    all causes of action arising from or related to" the SLA.  *Nedlloyd*, 3 Cal. 4th at 468.  This holds

5    true even if those causes of action are non-contractual, "including tortious breaches of duties

6    emanating from the agreement or the legal relationships it creates."  *Id.* at 470.

7          The parties disagree on whether Plaintiffs' consumer protection claims arise from or relate

8    to the SLA.  There is undoubtedly *some* connection between Plaintiffs' claim and the SLA—

9    Plaintiffs allege iOS 8 took up too much space and the SLA governs the use of iOS 8.  But the

10   parties dispute whether this nexus between Plaintiffs' claims and the SLA is close enough to

11   justify applying the choice-of-law clause.  The law is not entirely clear on this point.  *Nedlloyd*

12   states that choice-of-law clauses should apply broadly to "*all* disputes arising out of the

13   transaction or relationship."  *Id.* at 469.  However, *Nedlloyd* does not define what "arising out of

14   or related to" means.  And surveying other areas of California law shows that the definition of

15   "arising out of or related to" can vary depending on context.  For example, in the insurance

16   context, "California courts have consistently given a broad interpretation to the terms 'arising out

17   of' or 'arising from,'" holding that such language "does not import any particular standard of

18   causation or theory of liability" and only requires "a minimal causal connection or incidental

19   relationship."  *Medill v. Westport Ins. Corp.*, 143 Cal. App. 4th 819, 830 (2006) (quoting

20   *Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal. App. 4th 321, 328 (1999)).  By contrast, in the

21   workers' compensation context, an injury does not "arise out of the employment" unless it was

22   proximately caused by the employment.  *Guerra v. Workers' Comp. Appeals Bd.*, 246 Cal. App.

23   4th 1301, 1307 (2016).

24         Since there is no clear precedent explaining how closely claims must be tethered to a

25   contract to arise out of or relate to that contract, the Court's task is to "predict how the highest

26   state court would decide the issue using intermediate appellate court decisions, decisions from

27   other jurisdictions, statutes, treaties and restatements for guidance."  *Glendale Assocs., Ltd. v.*

28   Case No.: 5:14-cv-05659-EJD
     ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
     20

United States District Court
Northern District of California

1    *N.L.R.B.*, 347 F.3d 1145, 1154 (9th Cir. 2003) (quoting *N.L.R.B. v. Calkins*, 187 F.3d 1080, 1089

2    (9th Cir. 1999)).  In doing so, the Court finds most persuasive the line of California cases

3    addressing when non-contract claims are sufficiently connected to a contract to be subject to an

4    arbitration clause.  Determining whether non-contract claims fall within the scope of an arbitration

5    clause is closely analogous in nature to determining when non-contract claims fall within the

6    scope a choice-of-law clause.  California courts also similarly favor enforcing both arbitration and

7    choice-of-law clauses, further underscoring the similarity between how California law treats the

8    two types of clauses.  *Compare Ramos v. Superior Ct.*, 28 Cal. App. 5th 1042, 1051 (2018) ("Any

9    doubts concerning the scope of arbitrable issues will be resolved in favor of arbitration."), *with*

10   *Nedlloyd*, 3 Cal. 4th at 465 ("California courts shall apply . . . a strong policy favoring

11   enforcement of such [choice-of-law] provisions.").

12            California courts addressing arbitration clauses have consistently held that, when an

13   arbitration clause applies to claims "arising from or related to" the relevant contract, all claims

14   with "their roots in the relationship between the parties which was created by the contract" are

15   subject to arbitration, regardless of whether those claims are contractual.  *Howard v. Goldbloom*,

16   30 Cal. App. 5th 659, 664–65 (2018) (citations omitted); *see also Ramos*, 28 Cal. App. 5th at

17   1051–52; *Rice v. Downs*, 248 Cal. App. 4th 175, 186 (2016); *Bos Material Handling, Inc. v.*

18   *Crown Controls Corp.*, 137 Cal. App. 3d 99, 105 (1982).  This relationship-oriented test is

19   consistent with *Nedlloyd*, which likewise grounds its choice-of-law test on the importance of

20   maintaining clear boundaries around the *relationships* created by contract.  *Nedlloyd*, 3 Cal. 4th at

21   469–470 (causes of action that "emanat[e] from the agreement or the *legal relationship* it creates"

22   fall within the scope of the agreement's choice-of-law clause) (emphasis added).  Therefore, the

23   Court predicts that the California Supreme Court would use a "rooted in the relationship" test or

24   something similar to determine whether claims arise from or relate to contracts for choice-of-law

25   purposes.

26            The Court finds that none of Plaintiffs' claims are rooted in the relationship created by the

27   SLA.  For a consumer to agree to the SLA and enter into a contract with Apple, she needs to

28   Case No.: 5:14-cv-05659-EJD
     ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

United States District Court
Northern District of California

1    "US[E] [HER] iOS DEVICE OR DOWNLOAD[] A SOFTWARE UPDATE."  SLA at p. 1.

2    Because the consumer cannot use her device or download an update until after she purchases her

3    device, the SLA does not create a relationship between the consumer and Apple until after

4    purchase.  However, Plaintiffs' claims are that Apple misled them about the storage capacity of

5    various Apple devices *before* purchase, and that those misrepresentations caused injury by

6    influencing them to purchase those devices.  Given this sequence of events, Plaintiffs' and absent

7    class members' claims could not have been rooted in a relationship created by the SLA since no

8    such relationship existed at the time Plaintiffs and absent class members were allegedly injured.

9    This is especially so for the Upgrade Subclass.  Many Upgrade Subclass members would have

10   purchased their Apple devices before iOS 8 and the accompanying SLA even existed, so any

11   claims that those Upgrade Subclass members were injured when purchasing their Apple devices

12   are obviously not rooted in the SLA for iOS 8.[8]

13       The Ninth Circuit's decision applying California choice-of-law rules in *In re Hyundai &*

14   *Kia Fuel Economy Litigation*, 926 F.3d 539 (9th Cir. 2019), further reinforces this conclusion.

15   There, the en banc court explained that claims based on advertising misrepresentations about a

16   product do not arise from any contract formed when a consumer purchases that product.  *Id.* at 561

17   n.5.  And as the *Kia & Hyundai* court further observed, when the relevant contract says nothing

18   about the substance of allegedly misleading advertising, there is even less reason to think that

19   claims about misleading advertising arose out of that contract.  So too here.  Plaintiffs claim that

20   Apple falsely advertised available storage capacity, but the SLA says nothing about storage

21

22   ───────────────

[8] The Court's previous conclusion that the SLA's choice-of-law clause applies to the Upgrade
23   Subclass no longer holds because Plaintiffs have changed their theory of liability for the Upgrade
     Subclass.  The Court previously concluded that the choice-of-law clause applied to the Upgrade
24   Subclass because Plaintiffs were claiming injury from misrepresentations made during the upgrade
     process, and the SLA explicitly controlled the upgrade process.  SLA § 1(b) ("The terms of this
25   License will govern any iOS Software Updates provided by Apple that replace and/or supplement
     the Original iOS Software product . . . .").  Now that Plaintiffs are focusing on misrepresentations
26   at the time of purchase, this reasoning no longer fits with the Upgrade Subclass's claims.  To the
     extent that Plaintiffs rely on similar choice-of-law clauses in the SLAs for earlier versions of iOS,
27   those clauses are not relevant here because Plaintiffs' claims do not involve any of those earlier
     iOS versions.

28   Case No.: 5:14-cv-05659-EJD
     ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
     22

1  capacity or the amount of space that iOS 8 or other apps would take up.

2        Accordingly, Plaintiffs' claims fall outside the scope of the SLA's choice-of-law clause,

3  and the Court does not need to assess whether the clause is enforceable.  Either way, the SLA's

4  choice-of-law clause does not apply here.

5                    **b.      Governmental Interests**

6        Since there is no applicable choice-of-law clause, the Court turns to the governmental

7  interest test.  California courts apply California law by default "unless a party litigant timely

8  invokes the law of a foreign state."  *In re Hyundai & Kia*, 926 F.3d at 561 (quoting *Wash. Mut.*

9  *Bank*, 24 Cal. 4th at 919).  In that case, it is the burden of the party invoking foreign law, even in

10 the context of class certification, to show that foreign law should apply.  *Id.* at 561–63 (finding

11 predominance to be satisfied when objecting parties failed to meet their burden to show that

12 different states' law applied).  To meet its burden, the party seeking to apply foreign law must

13 prove that (1) the foreign law materially differs from California law; (2) there is a "true conflict"

14 in the sense that each state has an interest in applying its own law in the case; and (3) that the

15 foreign state's interest would be more impaired than California's interest if California law applied.

16 *Id.* at 562 (citations omitted).

17       Apple, as the proponent of foreign law in this case, bears the burden of showing that

18 foreign law applies.  It has met its burden as to the nationwide Upgrade and Preinstall Subclasses.

19 First, as Apple demonstrates and Plaintiffs do not contest, consumer protection laws vary from

20 state-to-state on material issues such as reliance, scienter, and statutes of limitations.  Class Opp'n,

21 App. A, ECF No. 201-1.  Second, there is a true conflict because each state "has an interest in

22 balancing the range of products and prices offered to consumers with the legal protections

23 afforded to them."  *Mazza*, 666 F.3d at 592.  Each state also has an interest in "being able to assure

24 individuals and commercial entities operating within its territory that applicable limitations on

25 liability set forth in the jurisdiction's law will be available."  *Id.* at 592–93 (quoting *McCann v.*

26 *Foster Wheeler LLC*, 48 Cal. 4th 68, 97–98 (2010)).  Third, Apple has shown that other states'

27 interests would be more impaired than California's because "the place of the wrong has the

28 Case No.: 5:14-cv-05659-EJD
   ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

United States District Court
Northern District of California

1    predominant interest." *Id.* at 593 (quoting *Hernandez v. Burger*, 102 Cal. App. 3d 795, 802

2    (1980)).  For nationwide classes, the place of wrong will vary, therefore requiring the Court to

3    consider several states' laws and causing choice-of-law issues to defeat predominance.

4              However, Apple has failed to show that choice-of-law issues create predominance

5    problems for the California Preinstall Subclass.  Although Apple has shown that foreign law

6    differs from California law and that there is a true conflict, it has not shown that foreign states'

7    interests would be impaired.  The California Preinstall Subclass is defined to include only

8    individuals who purchased their Apple devices in California.  Class Mot. 11.  For those

9    individuals, California is the place of the wrong, so California has the greatest interest.  Apple

10   speculates that individuals who purchased their devices in California may have nonetheless

11   received the alleged misrepresentations elsewhere.  Class Opp'n 27 n.4.  But that speculation is

12   not enough to meet Apple's burden.  And in any case, the place of the wrong is "the state where

13   the last event necessary to make the actor liable occurred."  *Mazza*, 666 F.3d at 593–94.  The last

14   event necessary for liability is the purchasing of an Apple device, and that event occurred in

15   California for the California Preinstall Subclass.

16             As a result, the Court finds that choice-of-law issues defeat predominance for the

17   nationwide Upgrade and Preinstall Subclasses but not for the California Preinstall Subclass.

18                        **2.    Cohesion**

19             In addition to choice-of-law issues, a lack of "cohesion among [class] members [due to

20   being] exposed to quite disparate information from various representatives of the defendant" can

21   defeat predominance.  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011),

22   *abrogated on other grounds by Comcast*, 569 U.S. 27; *see also Berger v. Home Depot USA, Inc.*,

23   741 F.3d 1061, 1069 (9th Cir. 2014) (cohesion was lacking when there were five different

24   allegedly misleading contracts that each required separate analysis and when signs discussing the

25   allegedly misleading subject varied between stores and over time), *abrogated on other grounds by*

26   *Microsoft Corp. v. Baker*, 582 U.S. 23 (2017).  Put differently, Plaintiffs cannot satisfy

27   predominance if "many class members were never exposed to the allegedly misleading

28   Case No.: 5:14-cv-05659-EJD

1    [statements]." *Mazza*, 666 F.3d at 595.  This reflects common sense.  In a case about

2    misrepresentations, the core misconduct alleged is that the defendant made false and misleading

3    statements.  If the statements alleged to be misleading varied in material ways across the putative

4    class, or if a significant portion of class members were not exposed to those statements, then the

5    very core of the case would vary on an individualized basis.

6            However, cohesion does not require all alleged misrepresentations to be exactly identical.

7    That is because courts take "the common sense approach that the class is united by a common

8    interest in determining whether a defendant's course of conduct is in its broad outlines

9    actionable." *DZ Rsrv.*, 96 F.4th at 1236 (quoting *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.

10   1975)).  Slight differences in wording, format, or context do not displace common questions when

11   the underlying misrepresentation is materially the same across all class members.  *Id.* (collecting

12   cases); *see also Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 631 (9th Cir. 2020) (affirming the

13   district court's reasoning that there was no predominance issue when all proposed class members

14   received the same illustration alleged to be misleading even though some of the information

15   surrounding those illustrations may have varied individually); *Miller v. Travel Guard Grp., Inc.*,

16   No. 21-cv-09751, 2023 WL 7106479, at *14 (N.D. Cal. Sept. 15, 2023) (no cohesion issue when

17   all alleged misrepresentations communicated the same three misleading ideas).  The key question

18   is whether the *nature* of the alleged misrepresentations is the same for the entire class.  *Cf. Ellis*,

19   657 F.3d at 984 ("Typicality refers to the nature of the claim or defense of the class representative,

20   and not to the specific facts from which it arose or the relief sought.").

21           Plaintiffs have shown that their proposed classes are sufficiently cohesive under this

22   standard.  Although Apple tries to frame this case as one about false labeling and casts doubt

23   about whether any significant number of class members saw Apple's labels, Class Opp'n 15, that

24   is too narrow a view of Plaintiffs' claims.  Plaintiffs challenged not just Apple's labels, but

25   Apple's entire marketing and advertising campaign identifying its devices as offering 16 gigabytes

26   of storage.  Second Consol. & Am. Class Action Compl. ("Compl.") ¶¶ 1, 19, 38, ECF No. 189.

27   Considering Apple's marketing and advertising as a whole, the Court finds that Apple's

*United States District Court*
*Northern District of California*

1    representations about the storage capacities of its devices were ubiquitous and consistent.  Storage

2    space is how Apple differentiated between different versions of devices within the same model

3    family.  *See* Dep. of Raja Bose 56:25–58:11.  Because Apple's devices were identified in part by

4    their advertised storage capacity, a consumer would necessarily need to know the advertised

5    storage capacity to purchase a device.  For instance, a consumer could not simply ask for an iPad

6    Air—she would need to identify whether she wanted the 16 GB, 32 GB, 64 GB, or 128 GB

7    version.  Am. Groehn Rep. tbl.5.  Given how Apple made storage capacity a central component of

8    its marketing, "there [is] little doubt that almost every class member [has] been exposed to"

9    Apple's alleged misrepresentations about storage capacity.  *Mazza*, 666 F.3d at 596.

10              **3.      Materiality and Reliance**

11          A plaintiff seeking to certify classes under the UCL, FAL, and CLRA must also grapple

12    with the issues of materiality and reliance.  The CLRA treats those two issues differently than the

13    UCL and FAL, so the Court addresses the CLRA separately.

14              **a.      CLRA**

15          To succeed on their CLRA claim, plaintiffs must prove that they and absent class members

16    relied on Apple's alleged misrepresentations.  *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d

17    1101, 1112 (N.D. Cal. 2016) (citations omitted).  Reliance can often "raise so many individualized

18    questions as to defeat predominance."  *Walker*, 953 F.3d at 631.  But California law leaves

19    putative classes with a way to avoid those individualized questions:  When an alleged

20    misrepresentation is material, a rebuttable presumption of reliance arises.  *Mass. Mut. Life Ins. Co.*

21    *v. Superior Ct.*, 97 Cal. App. 4th 1282, 1292 (2002) (quoting *Vasquez v. Superior Ct.*, 4 Cal. 3d

22    800, 814 (1971)).  So, if materiality is a common question, then a finding of materiality will raise

23    a classwide presumption of reliance that, unless Apple is able to rebut the presumption, elides any

24    individualized issues that may arise.

25          Before beginning its analysis of the facts in this case, the Court must first determine what

26    materiality and reliance mean in the CLRA context.  Despite the pervasiveness of CLRA cases,

27    the concepts of materiality and reliance are surprisingly muddled in the case law.  Start with

materiality.  Some courts hold that a misrepresentation is material "if it induced the consumer to alter his position to his detriment."  *Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 222 (2012) (quoting *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009)); *see also Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 453 (S.D. Cal. 2014); *True v. Am. Honda Motor Co.*, 520 F. Supp. 2d 1175, 1182 (C.D. Cal. 2007).  Others take a more relaxed approach, holding that a misrepresentation is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010) (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997)); *see also Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1258 (2018) (a fact is material when "a reasonable consumer would deem it important in determining how to act in the transaction at issue"); *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (in the UCL context, a misrepresentation is material "if a reasonable consumer would attach importance to it"); *Rasmussen v. Apple Inc.*, 27 F. Supp. 3d 1027, 1033 (N.D. Cal. 2014).

Courts have been similarly inconsistent in their approaches to reliance.  Some courts strictly require plaintiffs to show that they would have acted differently in the absence of the alleged misrepresentation in order to prove reliance.  *E.g.*, *Gray v. Dignity Health*, 70 Cal. App. 5th 225, 243 n.13 (2021); *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 810 (2007), *disapproved of on other grounds by Kwikset*, 51 Cal. 4th 310.  Others adopt the less demanding test that, while reliance requires plaintiffs to show that a misrepresentation "was an immediate cause" of injury, the misrepresentation need not be the "*sole or even decisive* cause of the injury." *Kwikset*, 51 Cal. 4th at 327 (emphasis added); *see also Lytle*, 2024 WL 3915361, at *15 (quoting *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020)).

Faced with this chaos, the Court looks to the sources of these competing tests to determine which ones it should adopt.  On that front, the path to resolving conflicts within the reliance case law is more apparent, so the Court begins there.  The less demanding reliance test—requiring only that the misrepresentation be *a* cause of injury—clearly has the stronger pedigree.  It is based on

1    California Supreme Court precedent, which controls over California Court of Appeal cases.  The

2    Ninth Circuit has also adopted the less demanding test in multiple precedential opinions, and those

3    opinions strictly bind this Court.  Therefore, the Court applies the less demanding test for reliance.

4        The choice of materiality tests is less straightforward.  The less demanding materiality test

5    has some basis in California Supreme Court and Ninth Circuit precedent, unlike the stricter

6    materiality test.  But those precedents are not directly on point; rather, they are analogies from

7    similar laws.  *See Engalla*, 15 Cal. 4th at 973–74 (common law fraud in the inducement); *Hinojos*,

8    718 F.3d at 1107 (UCL).  When that observation is combined with the Court's adoption of the less

9    demanding reliance test, though, the correct choice of materiality tests becomes more apparent.

10   Under the Court's reliance test, a misrepresentation explicitly does not need to be the decisive

11   cause of a consumer's injury for the consumer to have relied on that misrepresentation.  *Kwikset*,

12   51 Cal. 4th at 327.  The strict materiality test, however, does require the misrepresentation to be

13   the decisive cause because it requires the misrepresentation to alter the consumer's behavior.

14   However, it is nonsensical to require the misrepresentation to be the decisive cause in order to

15   establish a presumption of reliance while directly establishing reliance specifically does not

16   require the misrepresentation to be the decisive cause.  The strict materiality test is thus

17   incompatible with the Court's reliance test, so the Court adopts the less demanding materiality

18   test.

19       To summarize, then, plaintiffs must show that a reasonable consumer would attach

20   importance to the alleged misrepresentations to demonstrate materiality.  And to show reliance,

21   plaintiffs must show that the alleged misrepresentations were *a* cause of their decision to purchase

22   Apple devices though not necessarily the *sole or decisive* cause.

23       Applying these rules, the Court finds that materiality is a common question and that

24   Apple's alleged misrepresentations about storage capacity are material across the entire class.  The

25   reasonable consumer standard is an objective test, so there is no need to look at individual

26   circumstances.  *Bailey*, 338 F.R.D. at 399 (citation omitted); *cf. DZ Rsrv.*, 96 F.4th at 1035

27   (materiality for purposes of California common-law fraud uses an objective "reasonable

28   Case No.: 5:14-cv-05659-EJD

United States District Court
Northern District of California

consumer" that created common questions); *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1089, 1093 (9th Cir. 2010) (finding that Hawaii law applying a reasonable consumer standard posed common questions). Rather, the "reasonable consumer" is a hypothetical individual reflecting the aggregated preferences and motivations of "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances." *Moore*, 966 F.3d at 1017 (citation omitted). In this case, Dr. Groehn and Apple's expert have provided survey evidence that a significant portion of consumers found storage capacity to be important. Am. Groehn Rep. figs.12 & 13; Am. Expert Rep. of Sarah Butler ("Am. Butler Rep.") ¶¶ 78–79, ECF No. 151-3. Even though storage capacity may not have been the single most important factor to consumers, as the Court previously held, it did not need to be. Prior Order 21. Therefore, Apple's alleged misrepresentations are material, and a classwide presumption of reliance arises.

Previously, the Court concluded that Apple had produced sufficient evidence to rebut the presumption of reliance. Prior Order 20–21. To reach that conclusion, the Court focused on evidence showing that a substantial portion of consumers would not have changed their decisions to buy 16 GB Apple devices even if told that iOS 8 limited available storage capacity. *Id.* (citing Am. Butler Rep. tbls 13 & 14). In doing so, the Court assumed without deciding that the more stringent test for reliance applied. The Court made this assumption because Apple argued that reliance required a change in consumer behavior, and Plaintiffs did not challenge that formulation of reliance. In this round of briefing, though, Plaintiffs set forth a competing view of reliance that required the Court to more closely analyze the standard for reliance. With the benefit of this further briefing and additional scrutiny, the Court finds that, contrary to its previous assumption, reliance depends only on whether the alleged misrepresentation was *a* cause of the decision to purchase a 16 GB device. *Lytle*, 2024 WL 3915361, at *15.

On that front, Apple argues that Apple's representations about storage capacity were not a cause at all for many putative class members because they could have been exposed to information from other sources. Apple points to the potential for class members to have encountered media

Case No.: 5:14-cv-05659-EJD
ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

articles or to have had conversations with salespeople, family, and friends. Class Opp'n 6–8. Apple also suggests that class members' previous experience with other Apple products may have given them unique knowledge. *Id.* According to Apple, any of these could have revealed that iOS consumed storage space. *Id.* This argument does not take Apple far enough, though. As the Ninth Circuit emphasized in an earlier memorandum opinion in this case, consumers' knowledge that iOS 8 takes up *some* space is not the key issue; what matters is consumers' understanding of *how much* space will be taken up. Ninth Cir. Mem. Opn. 3, ECF No. 66. At best, Apple shows that a substantial portion of consumers understood that iOS 8 would take up some space. Am. Butler Rep. tbls.10 & 12. Apple offers no evidence showing how many consumers may have known the exact amount of space taken by iOS 8. That number could be significant, or it could be vanishingly small. If individualized issues involving consumers' external knowledge are "limited to a small number of class members," they do not defeat predominance. *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 n.11 (9th Cir. 2023). But the Court cannot tell how many consumers knew the exact size of iOS 8 or received relevant external information. Since Apple leaves the Court to speculate about the number of consumers with outside knowledge, it fails to meet its burden to rebut the assumption of reliance. *Id.* at 1068 ("We do not permit a defendant to support its invocation of individualized issues with mere speculation.").

As a result, materiality and reliance issues do not defeat predominance as to Plaintiffs' CLRA claims.

### b.   UCL and FAL

The UCL and FAL require plaintiffs to show only that "members of the public are likely to be deceived." *Pulaski*, 802 F.3d at 985–86 (quoting *In re Tobacco II*, 46 Cal. 4th at 312, 320). There is no requirement that plaintiffs establish proof of reliance as to absent class members, *id.*, so reliance cannot raise individualized issues. Materiality, meanwhile, is only relevant to certain defenses that Apple can raise. *Hinojos*, 718 F.3d at 1107. And in any case, as the Court found above in its analysis of the CLRA, materiality can be resolved on a classwide basis.

Apple takes issue with the Court's statement of law that the UCL and FAL do not require

proof of reliance for absent class members.  Class Opp'n 19–20.  Apple's arguments on this point are not easy to follow—on one hand Apple seems to acknowledge that Proposition 64's amendments to the UCL do not require proof of reliance for absent class members, and on the other Apple seems to suggest that not requiring such proof runs counter to Proposition 64.  *Id.*  But regardless of what Apple means to argue, the law is clear.  The California Supreme Court explicitly interpreted Proposition 64 to mandate a reliance requirement "only [as] to the class representatives, and not [as to] all absent class members."  *In re Tobacco II*, 46 Cal. 4th at 306[9]; *see also Mazza*, 666 F.3d at 595–96 ("[T]he California Supreme court reconfirmed that class members do not need to demonstrate individualized reliance, and that Proposition 64 imposes its reliance requirements only on the named plaintiff, not unnamed class members."); *Walker*, 953 F.3d at 630–31 (similar).  Apple is wrong to suggest that California law requires proof of reliance for absent class members.

Apple's remaining arguments fare no better.  Apple asserts that, by certifying a class without requiring proof of reliance for absent class members, the Court impermissibly "arm[s] absent class members with additional *substantive* rights."  Class Opp'n 20.  In support of this proposition, Apple cites to *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), and *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010).  *Id.*  Unfortunately, Apple does not elaborate on these citations.  And the Court cannot intuit how these two cases fit together because they discuss very different issues.  *TransUnion* concerns the concreteness of the injury necessary for Article III standing while *Shady Grove* concerns the extent to which Rule 23 preempts state law.  Finding no apparent connection between the two cases, the Court addresses each of their issues as separate arguments.

*Standing.*  To the extent Apple contends that lack of reliance equals lack of standing since reliance is needed for injury, the Ninth Circuit has already rejected this exact argument in *Mazza*. 666 F.3d at 594–95.  There, the Ninth Circuit explained that, despite the lack of reliance, the

---

[9] The California Supreme Court spoke in terms of statutory standing requirements rather than reliance but explained that standing is established by reliance.

1    plaintiffs established there was injury for Article III purposes based on the theory that class

2    members paid more for a product than they otherwise would have paid or that they bought the

3    product when they otherwise would not have.  *Id.*  This is a classic monetary injury satisfying

4    Article III's requirements.  *TransUnion*, 594 U.S. at 425.  It is also the same theory of injury that

5    Plaintiffs adopt in this case.  Compl. ¶ 37 ("Had Plaintiffs known that the operating system and

6    other pre-installed software consumes a substantial portion of the storage capacity of the Devices,

7    they would have reconsidered their decisions to purchase Devices, or would have paid less.").

8    Thus, Article III standing is no obstacle to class certification.

9         **Preemption.**  The Court also finds unavailing any suggestion that Rule 23 preempts the *In*

10   *re Tobacco II* rule requiring reliance for class representatives but not absent class members.  In

11   deciding whether Rule 23 preempts state law, courts apply a two-step test.  First, they ask whether

12   Rule 23 conflicts with the relevant state law because they give different answers to the "same

13   question," meaning that one provides that a suit *may* be maintained as a class action while the

14   other provides that the suit *may not* be maintained as a class action.  *Shady Grove*, 559 U.S. at

15   398–99.  Second, if there is a conflict, Rule 23 prevails "unless it exceeds statutory authorization

16   or Congress's rulemaking power."  *Id.* at 398.  The Rules Enabling Act, 28 U.S.C. § 2072, sets the

17   parameters of this second step.

18        Any argument that Rule 23 preempts *In re Tobacco II* fails at the first step.  Nothing in the

19   text of Rule 23 mandates that the elements of a class representative's claims be identical to the

20   elements of an absent class member's claims.  The closest that Rule 23 comes to such a condition

21   is through typicality, which requires that "the claims or defenses of the representative parties are

22   typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  On its face, the typicality

23   requirement says nothing about the elements of the class representatives' or absent class members'

24   claims.  Case law also clarifies that it is not the *elements* that matter, but rather the *nature* of the

25   claims and defenses that matters.  *Ellis*, 657 F.3d at 984.  Further, typicality does not require

26   complete identity of claims and defenses between class representatives and absent class members.

27   Their claims and defenses need only be "reasonably co-extensive."  *Castillo*, 980 F.3d at 729.

28   Case No.: 5:14-cv-05659-EJD

1    Rule 23 permits class certification even when class representatives are subject to defenses that

2    absent class members are not, so long as those unique defenses do not "threaten to become the

3    focus of the litigation." *Hanon*, 976 F.2d at 508.

4        Thus, typicality can easily be reconciled with the *In re Tobacco II* rule that only class

5    representatives, but not absent class members, need to establish reliance.  The reliance requirement

6    for class representatives is, in effect, a unique defense that applies only to class representatives but

7    not to absent class members.  If there are meritorious arguments against a class representative's

8    reliance that would threaten to become the focus of litigation, then the representative is not typical,

9    and a class may not be certified.  *In re Tobacco II* does not require otherwise, so it does not

10   conflict with that outcome.  If, however, there are no meritorious reliance arguments against the

11   class representative, reliance would not threaten to become the focus of litigation and the class

12   could be certified.  Again, *In re Tobacco II* does not conflict with that outcome by requiring

13   otherwise.  In short, Rule 23 is fully consistent with *In re Tobacco II*.

14       Even if there were a conflict, it would violate the Rules Enabling Act for Rule 23 to

15   preempt the *In re Tobacco II* reliance rule by requiring plaintiffs to prove reliance for absent class

16   members.  The Rules Enabling Act empowers the U.S. Supreme Court to promulgate binding

17   procedural rules, including, as relevant here, the Federal Rules of Civil Procedure.  28 U.S.C.

18   § 2072(a).  However, the authority to do so is limited: such a rule cannot "abridge, enlarge or

19   modify any substantive right."  *Id.* § 2072(b).  This limitation ensures that rules promulgated

20   under § 2072 "really regulat[e] procedure."  *Shady Grove*, 559 U.S. at 407 (plurality opinion)

21   (alteration in original) (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941)).  A rule violates

22   that limitation when it "alter[s] the rules of decision by which the court will adjudicate

23   [substantive] rights."  *Id.* (cleaned up).  If Apple were correct that Rule 23 requires plaintiffs to

24   prove reliance for absent class members, that would "amount to abridging a substantive right,"

25   since plaintiffs would have to prove reliance for absent class members in federal class actions but

26   not in state class actions.  *DZ Rsrv.*, 96 F.4th at 1238.  So "[c]ontrary to [Apple's] contention, the

27   Rules Enabling Act *requires* application" of *In re Tobacco II*, it does not prohibit such

28   Case No.: 5:14-cv-05659-EJD

1    application.[10]  *Id.*

2         In summary, issues surrounding materiality and reliance do not defeat class certification of

3    Plaintiffs' UCL and FAL claims.

4                    **4.    Injury**

5         Most of Apple's arguments regarding injury repackage those that the Court already

6    addressed above in the Cohesion and Materiality and Reliance sections of this Order, and the

7    Court does not repeat its analysis of those arguments here.  Apple raises only two additional

8    arguments as to injury, one of which is better addressed as an attack on Plaintiffs' theory of

9    damages.  Accordingly, the only argument that the Court discusses in this section is Apple's claim

10   that consumers who knew iOS 8 took up storage capacity were not injured because they received

11   what they expected.  Class Opp'n 22.  This "benefit of the bargain" defense is only viable when

12   the alleged misrepresentations are not material.  *Hinojos*, 718 F.3d at 1107 (citing *Kwikset*, 51 Cal.

13   4th at 332–33).  As the Court already concluded, the alleged misrepresentations here are material.

14   *Supra* Section III.B.3.  Accordingly, Apple cannot raise a "benefit of the bargain" defense, and

15   Apple's argument about consumer knowledge poses no obstacle to predominance.

16                   **5.    Damages**

17        For Plaintiffs to demonstrate predominance, they "must proffer a damages model showing

18   that 'damages are susceptible of measurement across the entire class for purposes of Rule

19   23(b)(3).'"  *Vizcarra*, 339 F.R.D. at 553 (quoting *Comcast*, 569 U.S. at 35).  Plaintiffs have

20   offered two potential damage models for this purpose—the Incremental Price Regression and

21   Hedonic Regression Models.  Am. Groehn Rep. ¶¶ 94–111.  Apple raises a bevy of objections, but

22   those are largely *Daubert* issues that the Court resolved in Section II above.  *Daubert* issues aside,

23   Apple makes just two arguments against Plaintiffs' damages theory.  The Court finds that neither

24

25   [10] The Court applied the *Shady Grove* plurality's test for determining whether Rule 23 would
     violate the Rules Enabling Act as applied.  The plurality test is strictly based on prior Supreme
26   Court precedent, so even if it is not technically binding, it is a persuasive statement of binding
     precedent.  *See Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1336 (D.C. Cir. 2015).  Further,
27   the concurrence's proposed test is even broader than the plurality's, so applying the concurrence's
     test would lead to the same result.  *See Shady Grove*, 559 U.S. at 422–23 (Stevens, J., concurring).

28   Case No.: 5:14-cv-05659-EJD
     ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
     34

United States District Court
Northern District of California

1    ultimately bars class certification.

2           First, Apple contends that Plaintiffs improperly applied a "fraud on the market" theory to

3    measure damages.  Class Opp'n 22; *see also* Expert Mot. 17–18.  This is a somewhat curious

4    argument because "fraud on the market" is not a theory of damages at all.  Instead, it is a theory of

5    reliance in federal securities fraud litigation.  *Amgen*, 568 U.S. at 461.  "Fraud on the market"

6    flows from the premise that, in efficient markets, the market price of shares reflects and

7    incorporates all publicly available information.  *Id.* at 461–62.  As such, when an investor

8    purchases a share at market price, she implicitly relies on all publicly available information,

9    including any alleged misrepresentations.  *Id.*  As a result, in efficient markets, there is a rebuttable

10   presumption of reliance.  *Id.*  However, Plaintiffs here do not attempt to prove reliance through a

11   "fraud on the market" theory by claiming that Apple's alleged misrepresentations were

12   incorporated into the prices of Apple devices.  Instead, the presumption of reliance in this case

13   arises from the materiality of the alleged misrepresentations.  *Mass. Mut.*, 97 Cal. App. 4th at

14   1292.

15          Rather than objecting to use of the "fraud on the market" theory, Apple seems to be

16   criticizing Plaintiffs for adopting the theory's underlying premise.  Apple appears to reason as

17   follows:  (a) the market for iPhones and iPads is not an efficient market; (b) because the market is

18   not efficient, some information will not be reflected in price, and even material misrepresentations

19   may not be reflected in price; (c) since not all information is necessarily incorporated into the price

20   of iPhones and iPads, "damages resulting from the alleged misrepresentations will not possibly be

21   uniform" because difference consumers might value storage differently.  Expert Mot. 18 (citing *In*

22   *re POM Wonderful LLC*, MDL No. 2199, 2014 WL 1225184, at *1–4 (C.D. Cal. Mar. 25, 2014)).

23   From this, Apple concludes that "it is wrong to simply assume that all consumers would have paid

24   less absent the misrepresentation," and therefore that Plaintiffs' assumption of uniform damages

25   invalidates their theory of damages.  *Id.*

26          This line of reasoning might hold water if the measure of Plaintiffs' price premium

27   damages were the price that the market would have set absent the alleged misrepresentations.  But

28   Case No.: 5:14-cv-05659-EJD
ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
35

United States District Court
Northern District of California

that is not the measure of damages.  Instead, damages are measured by what a reasonable consumer would be willing to pay.  *Pulaski*, 802 F.3d at 989.  The reasonable consumer is a single, hypothetical person and would be the same across the entire class.  *See Moore*, 966 F.3d at 1017.  For this reason, damages would be uniform as Plaintiffs presumed.[11]

Apple's final argument is that it makes no sense for Plaintiffs to claim that members of the Upgrade Subclass were injured at the time of purchase before iOS 8 came into existence.  Class Opp'n 26.  If that is true—and the Court expresses no opinion on whether these claimed damages are viable—that would negate damages as to the entire Upgrade Subclass.  So even if Apple's skepticism about Plaintiffs' theory is founded in this regard, it would not create individual issues that defeat predominance.

As such, there are no damages issues that prevent class certification.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Apple's motion to exclude and GRANTS IN PART and DENIES IN PART Plaintiffs' motion for class certification.  The Court CERTIFIES the California Preinstall Subclass and declines to certify the nationwide Upgrade and Preinstall Subclasses.  Plaintiffs ask the Court to certify the two nationwide classes as liability-only classes under Rule 23(c)(4) if the Court declines to certify them under Rule 23(b)(3), Class Mot. 33–35, but the Court declines that request as well because any such nationwide liability-only classes would still face intractable individualized choice-of-law issues.

Within **twenty-one (21) days** of this Order, the parties shall submit a stipulated schedule for this case up to and including the trial setting conference.  Though the parties need not agree on

---

[11] Although not necessary to the Court's reasoning, the Court observes that few, if any, markets for consumer products will be efficient.  If the lack of efficiency means that "damages resulting from the alleged misrepresentations will not possibly be uniform," *In re POM Wonderful*, 2014 WL 1225184, at *4, that would lead to the seemingly categorical conclusion that cases regarding misrepresentations about consumer products can never be maintained as class actions.  This, of course, would be a dramatic result that flies in the face of the many consumer class actions that courts have certified.

Case No.: 5:14-cv-05659-EJD
ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS
36

United States District Court
Northern District of California

1   dates for the pretrial conference or trial, they should indicate the time that they expect the case to

2   be ready for trial.  If the parties are unable to reach agreement, instead of a stipulation, they shall

3   file a joint status report containing their competing scheduling proposals.

4        **IT IS SO ORDERED.**

5   Dated: September 30, 2024

6

7

8        EDWARD J. DAVILA
         United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   Case No.: 5:14-cv-05659-EJD
     ORDER RE MOTS. TO EXCLUDE & TO CERTIFY CLASS

United States District Court
Northern District of California